396 So.2d 1254 (1981)
STATE of Louisiana
v.
Roosevelt DISON.
No. 80-KA-2191.
Supreme Court of Louisiana.
April 6, 1981.
*1255 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ronald C. Martin, Dist. Atty., S. Michael Henry, Asst. Dist. Atty., for plaintiff-appellee.
Charles R. Whitehead, Jr., Whitehead & McCoy, Natchitoches, for defendant-appellant.
DIXON, Chief Justice.
Defendant was convicted of first degree murder and was sentenced to life imprisonment. The charge arose out of the "contract killing" of Charles Rollo in Natchitoches Parish. Although circumstantial evidence was adduced at trial that tended to confirm defendant's involvement in the crime, the state's case relied primarily upon a confession given by defendant, in which he admitted shooting the victim after he was offered money to do so. We are called upon to review the admissibility of the confession.
The basic facts of this case are not in dispute. On Easter Sunday of April 15, 1979, Charles Rollo was killed by a shotgun blast while standing in the driveway of his home in Natchitoches. A passing motorist saw a light colored automobile pulling out of the driveway at the time that the homicide was committed; steam was escaping from the hood of the car. A short while later, the same motorist again saw the car, stopped at the foot of a bridge. He was unable to identify the driver. When the officers investigating the shooting received this information, they contacted a service station manager in nearby Powhatan. They learned that defendant had stopped at the station twice on the Saturday before the murder, driving a yellow Cadillac that had been overheating. On Thursday, April 19, defendant was stopped for questioning in Coushatta. He was later arrested. The murder weapon was subsequently recovered from the waters beneath the bridge; it was eventually traced to Don Willie, a neighbor of James Ray Salim.
Although there is some question as to whether defendant received his Miranda warnings at the time of his arrest in Coushatta, it is clear that no statements were obtained from him at that time. However, defendant testified that, during the time that he was questioned in Coushatta, a deputy told him that "if I would lay my cards on the table, he would see to it that I come out of this smelling like a rose."
Defendant was then transported to Natchitoches. He was not questioned during the trip. After he arrived at the Natchitoches jail, though, defendant claimed that a deputy told him to take off his shirt, stating, "Now, what he need (sic) is a boot in the rear end." Defendant was questioned for several hours on the night of April 19. During this questioning, he alleged that an unidentified plainclothes officer told him, "Don't you know .... that.... people .... they will find you in the river, and no one know how you got there?" Although defendant stated that this menacing statement troubled him in the days to come, he continued to refuse to divulge any information about the homicide.
On the morning of Friday the 20th, defendant was reportedly questioned again for a short while. He stated that no "concrete promises" were made to him, but that deputies "said they couldn't do it, they'd get... the sheriff to do it."
Pursuant to C.Cr.P. 230.1, a hearing was held on Saturday the 21st, at which time defendant was fully informed of his right to counsel. Although the chronology is not clear from the record, defendant had been contacted by Robert L. Salim, an attorney, at some time during this period, in regard to legal representation. At the "72-hour hearing," defendant informed the judge that he did not want an appointed counsel, because he was attempting to retain an attorney privately. However, attorney Salim's fee was not acceptable to defendant's family, and he never became counsel of record. The record does not indicate when, if ever, defendant learned that Mr. Salim would not represent him. Defendant did learn that Robert Salim was the brother of James Ray Salim, and deputies allegedly told him that Robert Salim had visited him in jail to find out the location of his cell, "so *1256 they can send somebody in there to kill you." Defendant, according to his own testimony, was unmoved by this warning: "It didn't disturb me one way or the other.... I didn't believe it."
The record does indicate that telephone calls were received at the Natchitoches jail, in the nature of threats on defendant's life. Because of this, the sheriff's office decided to remove defendant from Natchitoches. In the early morning hours of April 24, defendant was taken to Lake Charles by Deputies Delphin and Coleman. Defendant stated that the two officers attempted to question him about the homicide again, but that he forestalled them:
"... I didn't want to make `em angry.... cause I didn't know what was going on, I didn't know .... man, after this guy had told me, that, `You know you can get caught in the river, and nobody know how you got there,' that was on my mind, so I didn't know what was happening, so, you know, to keep from telling them don't ask me no questions, I just got off on another conversation."
Defendant's conversation during the drive was centered on the Muslim religion, rather than the homicide. However, defendant claims that the two deputies told him that the murder weapon had been discovered, and that it had been traced to him by his prints. Defendant also alleged that Deputy Delphin told him that, although he could not personally offer him any promises of leniency, the sheriff could, and that the sheriff could purchase an airplane ticket and send defendant wherever he wanted to go.
Upon arriving in Lake Charles, defendant asked to talk privately with Sheriff Sam James, of Natchitoches Parish. Sheriff James was contacted, and he arrived in Lake Charles several hours later. Defendant and the sheriff had a private talk. It is disputed whether defendant was given his Miranda warnings prior to this conversation. Defendant's version of the substance of the talk is as follows:
"Okay. He told me, he said, `Son,' he said, `if you put your cards on the table with me,' he said, `if you be fair with me, I'll be fair with you,' he say, `I promise you I'll do everything to help you. If you lay your cards on the table,' he said, `you'll come out of this smelling like a rose.' He said, `I could....' I say, `That sure is a nice suit you got on.' He say, `Yeah, I can get you one just like it. And I can buy you a ticket and put you on a plane and have you out of here. Send you anywhere you want to go.' And, uh.... I questioned him. I said, `Could you do that?' He said, `Yeah, I can do it.' And, he said, `I will do it.'
Q. What else, if anything, did he tell you?
A. That's about all he told me."
In addition, defendant later remembered that the sheriff told him that he would have an armed robbery charge dropped if defendant would make a confession. Defendant also claimed that many other promises were made, but that he could not remember them all.
Immediately after his conversation with the sheriff, in which defendant admitted killing the victim, defendant was taken into a room with the two deputies from Natchitoches Parish and another deputy, to transcribe the confession. Again, the testimony concerning the Miranda warnings is contradictory.
On May 5, defendant was moved from Lake Charles to Many, again for reasons of safety. The sheriff and an unidentified deputy accompanied defendant, and defendant contends that the sheriff repeated the promises he had made in Lake Charles. Subsequently, defendant was questioned in Many by Deputies Coleman and Delphin, and a two page statement was transcribed. The purpose of taking this statement was said to be to clarify some areas of doubt in the prior, four page confession.
At the hearing on the motion to suppress, the testimony of Deputies Delphin and Coleman and that of Sheriff James completely contradicted defendant's. At trial, the three officers essentially reiterated their testimony that no inducements had been offered to defendant prior to the confession, *1257 and that defendant was fully apprised of his constitutional rights.[1]
R.S. 15:451 clearly states that it is the prosecution's burden to prove that a confession was obtained voluntarily before it can be admitted into evidence:
"Before what purposes to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
It is obvious that, if the allegations made by defendant are true, the confession would be inadmissible. The critical question is whether the state satisfactorily rebutted the claims made by defendant and carried its burden of proving the voluntariness of the confession. In this regard, two principles are pertinent. First, the state cannot rely upon general disclaimers that no undue influence was brought to bear upon a defendant who confesses to a crime: the defendant's specific allegations must be specifically rebutted. See State v. Franklin, 381 So.2d 826 (La.1980), State v. Davis, 380 So.2d 607 (La.1980). Second, when credibility is at issue, a trial judge's determination should not be upset unless it is unsupported by the evidence. See State v. Robinson, 384 So.2d 332 (La.1980), State v. Jackson, 381 So.2d 485 (La.1980).
Defendant's version of the events leading up to his confession contains several salient points. From the time that he was arrested until the time he arrived in Lake Charles, defendant had been unwilling to divulge any information concerning the homicide. He made no inculpatory statements until he had a private talk with Sheriff James. For this reason, it does not appear that the allegations concerning the conduct of the various officers before the trip to Lake Charles are particularly relevant. Defendant stated that, when he was questioned in Natchitoches, he "took the Fifth;" on the drive to Lake Charles he managed to maneuver the conversation away from his involvement in the homicide. Defendant stated that he knew that only Sheriff James could make any "concrete promises" of leniency, and for that reason refused to talk to the two deputies. It was not until after his conversation with the sheriff that defendant made his confession; he stated firmly that he would not have confessed but for the sheriff's inducements.
It should also be noted that defendant had previously been imprisoned after a conviction for negligent homicide; nothing in the record indicates that defendant was not able to understand his right to remain silent or his right to the assistance of counsel. The record does indicate that defendant was informed of his rights on numerous occasions.
Point by point, Sheriff James contradicted defendant's version of their conversation. The sheriff positively testified that he made no promises at all to defendant: "... I couldn't promise him anything. It would be left up to the court system." The sheriff further testified:
"I told Dison this. What he needed to do was lay the cards on the table. Just tell.... all I wanted him to do was tell the truth about what happened, and who all was involved.
. . . . .
... All I was trying to do is get him to implicate who all was involved."
The sheriff's statement underscores the fact that defendant's confession was something of a breakthrough in the investigation of the murder. The investigating authorities were convinced that the murder was the product of a conspiracy, but no firm evidence existed as to the identity of those involved. By implicating others, defendant's confession gave valuable assistance to *1258 the investigation. To this extent, defendant may have thought that his cooperation with the sheriff would be to his benefit. His belief was certainly confirmed when, subsequent to the confession, he met with Sheriff James and Judge Cunningham. According to the sheriff, the judge advised defendant to "stand pat" by his statement; according to defendant, the judge told him that he would either have the armed robbery charge dropped or make the sentence concurrent with the sentence on the murder charge. This unusual meeting, even though it occurred after the confession was obtained, appears to have given an official sanction to defendant, and surely might have confirmed his belief that the confession might entitle him to favored treatment.
Indeed, the sheriff admitted that he told defendant, "... in the past, anybody that tried to help themselves, usually got help." When the second statement was taken from defendant in Many, Deputy Coleman testified that he remarked to defendant that, if he cooperated, he would do what he could to help him. Both officers testified, however, that they told defendant that they could promise him nothing. Absent such an admonition, and in light of all the circumstances of the case, these statements would certainly constitute prohibited inducements.
Even if we accept the trial judge's determination that defendant's version of his conversation with the sheriff is not worthy of belief, the testimony of the sheriff and Deputies Coleman and Delphin is deeply troubling. The law has long been settled that confessions obtained by "any direct or implied promises, however slight, [or] by the exertion of any improper influence," are inadmissible under the terms of the Constitution. Bram v. United States, 168 U.S. 532, 542-43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897). At the minimum, an implied promise was made to defendant that he would probably receive some type of help if he confessed. Were it not for the sheriff's sworn testimony that he told the defendant that he could make no promise or offer of leniency, this statement would constitute an improper exertion of influence over the defendant, rendering his confession inadmissible. Upon consideration of the entire transcript of this matter, it is evident that the sheriff genuinely negated any implication that defendant would receive special consideration in return for his confession. The sheriff's statements to defendant that he could promise him nothing, and that the "court system" was the ultimate arbiter of his case, make the facts of this case similar to those in State v. Vernon, 385 So.2d 200 (La.1980), in which the defendant was merely told that his cooperation would be brought to the attention of the district attorney. As the sheriff later testified at trial:
"... I knew from the beginning, or I figured I knew, that there was more involved in this deal than Roosevelt Dison. And if he wants to call it a promise, or anybody does, I told him to get all his cards on the table, because that was what it was going to take [before] the District Attorney, or the Judge, or any Court would give him any consideration. Just go ahead and tell the whole entire thing."
We find no error in the trial judge's determination that defendant's testimony was simply not credible. The prosecution satisfactorily rebutted defendant's allegations that he was coerced and induced into confessing. And, because the record indicates that defendant was apprised of his rights and advised that no promises could be made to him, we find no error in the admission of the confession.
The conviction and sentence are affirmed.
NOTES
[1] In his other assignment of error, defendant contends that he should have been permitted to testify at trial during the state's case in chief for the limited purpose of giving his version of the events leading up to the confession. Reliance is placed upon the opinion in State v. Lovett, 345 So.2d 1139 (La.1977). Defendant fails to note that the rationale underlying the Lovett decision was legislatively supplanted in 1978, when C.Cr.P. 703(B) was amended to provide that a defendant who becomes a witness at trial is subject to cross-examination on the entire case. Acts 1978, No. 746. The constitutionality of the provision was upheld in State v. Day, 391 So.2d 1147 (La.1980). This assignment of error is without merit.