426 So.2d 158 (1983)
STATE of Louisiana
v.
John E. BROGDON.
No. 82-KA-0925.
Supreme Court of Louisiana.
January 10, 1983.
*162 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Morel, Jr., Dist. Atty., Gregory Champagne, Don Almerico, Asst. Dist. Attys., for plaintiff-appellee.
Victor Bradley, Jr., Norco, Manina D. Dubroca, Kenner, for defendant-appellant.
BLANCHE, Justice.
Defendant John Brogdon was convicted of first degree murder for the killing of eleven-year old Barbara Jo Brown, a violation of LSA-R.S. 14:30. The jury of twelve recommended that the defendant be put to death, and the trial court sentenced him accordingly. In reaching its conclusion, the jury found three aggravating circumstances: (1) the defendant had been engaged in the perpetration of aggravated rape at the time of the murder; (2) the offense had been committed in an especially heinous, atrocious, and cruel manner; (3) the victim had been an eyewitness to a crime alleged to have been committed by the defendant. La.C.Cr.P. art. 905.4, secs. (a), (g), (h).
In appealing his conviction and sentence, the defendant assigns sixteen errors. Our review of the record shows that none of the assignments warrant reversal of the defendant's conviction. Accordingly, we affirm the jury's determination of the defendant's guilt. However, because the trial judge erroneously instructed the jurors that they were required to impose the death sentence if they found that the evidence established the existence of one or more aggravating circumstances, we must vacate the death sentence and remand the case for a new sentencing hearing for the reasons we assigned in our recent opinion of State v. Watson, 423 So.2d 1130 (La.1982). The defendant has neither briefed nor argued four of the errors assigned with the trial court. Generally, assignments neither briefed nor argued are considered as abandoned. However, in cases where the death penalty has been imposed, we have generally reviewed such assignments as a matter of policy. State v. Lindsey, 404 So.2d 466 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981). Since these assignments present no substantial legal or factual questions requiring detailed analysis and involve matters governed by established principles of law, they will not be addressed in the body of this opinion, but instead will be set out in an appendix which will remain unpublished, yet nevertheless form part of the official record of this case.

FACTS
At approximately 7:00 p.m. on October 7, 1981, Barbara Jo Brown (Bobby) and her older sister Rubeta walked to a Time Saver convenience store a few blocks from their Luling, Louisiana home to use a pay telephone. While on the telephone, Rubeta saw the nineteen-year old defendant and seventeen-year old Bruce Perritt arrive at the store.[1] Perritt approached Bobby and put his arm around her. Rubeta called her away and the two left the store. On the way home, Rubeta gave Bobby permission to visit a neighbor and told her that she would return for her in a few minutes.
*163 Rubeta returned for Bobby about ten minutes later and learned that she had returned to the Time Saver. Unable to find Bobby at the convenience store or at the homes of any of their neighbors, Rubeta notified their mother, who was at work, and called the police. A young friend of Bobby's stated that she had seen her earlier that evening in a car, sitting between the defendant and Perritt. Shortly after 9:00 p.m., two young men were driving behind a levee near Luling and came upon Bobby's body. Perritt's vehicle was parked a short distance away. Shortly thereafter, two other men saw the defendant and Perritt walking on a road near the levee. The defendant was without a shirt and appeared disheveled. Based on this set of circumstances, the defendant and Perritt were arrested for the murder of Barbara Jo Brown.
The defendant voluntarily confessed to the murder. In the statement, he described a crime of unparalleled savagery and brutality. The defendant recounted how he and Perritt had picked up Bobby at the Time Saver and driven her to the levee. The two repeatedly raped her and forced her to perform oral sex on them, all the while pummeling her with their fists. They then broke bottles on the cement and stabbed her repeatedly with the jagged edges. Perritt found a brick and hurled it at Bobby, striking her in the head. The defendant then used the brick to beat her until he "thought she was dead." Throughout the ordeal Bobby had pleaded for her life and fought back against her two assailants as best she could. The extensive bruises and lacerations on her forearms were described by the pathologist as defensive in nature. The defendant stated that he had killed Bobby because she knew her assailants, and he was afraid that she would "tell on them" for raping her.
At trial, the pathologist testified that Bobby had been brutalized so extensively that her skull, internal organs, and vertebrae were exposed. Bobby's vagina had been pierced with a sharp object all the way into her abdominal cavity. Two blood-covered, pointed sticks were found at the scene of the crime, both of which the defendant and Perritt had used to brutalize and torture their victim beyond that which they could accomplish with their hands and other crude weapons.
The defendant attempted to plead guilty to the crime, but the trial judge refused to accept the plea and entered for him pleas of not guilty and not guilty by reason of insanity.[2] A sanity commission was appointed by the trial court, and, after a separate sanity hearing, the defendant was found capable of standing trial. At trial, the defendant's only witness was a psychologist who testified that the defendant had suffered a psychotic episode at the time of the offense and did not, at that time, know the difference between right and wrong. She testified that the defendant has a borderline I.Q. and personality disorder which would account for his violent and aggressive nature. In rebuttal, the two sanity commissioners testified for the state that the defendant had understood the natural consequences of his acts at the time of the offense.

ASSIGNMENT OF ERROR NO. 1[3]
By this assignment, the defendant urges that the trial court erred in denying his motion for a change of venue without holding a contradictory hearing on the matter. More specifically, he argues that pre-trial publicity relating to the case, particularly that concerning the trial court's rejection of *164 his guilty plea, had been extensive enough to warrant a change of venue. See La.C. Cr.P. arts. 621, 622.
On December 10, 1981, at a hearing on the defendant's motion to suppress his confession, the defendant called to the court's attention that a motion for a change of venue had been filed. The court denied the motion, but reserved the defendant's right to re-urge the motion at the time of jury selection should it become apparent that an impartial jury could not be selected due to prejudicial pre-trial publicity. The trial judge made it clear to counsel that he would be amenable to granting the motion for change of venue at that time if the proper grounds were shown. Defendant did not object to the judge's ruling. Moreover, counsel failed to re-urge the motion before, during, or after voir dire as suggested by the judge. Consequently, the defendant never adduced any evidence in support of his motion, relying instead on voir dire to uncover the existence of any community prejudice.
During voir dire, defense counsel and the prosecution questioned all prospective jurors extensively about whether any of them had been prejudiced by or had formed a fixed opinion as to the defendant's guilt or innocence as a result of news media accounts of the case. Notably, a full jury was ultimately impaneled.[4] But following the jury selection, the defendant did not re-urge the motion for change of venue; rather, the defendant filed a motion to quash the entire venire from which the final jury had been selected on the grounds that poor whites and teenagers had been systematically excluded as potential jurors. The trial judge denied this motion, and the case proceeded on the merits.
It is apparent from the record that the trial judge did not refuse to hold a contradictory hearing on the motion for change of venue; rather, he requested that the defendant defer final disposition of the matter until the time of voir dire where it could be more readily determined whether it would be impossible to empanel an impartial jury. Therefore, the ultimate question for our resolution seems to be whether the trial court's denial of the pre-voir dire motion for a change of venue without a contradictory hearing, but with an invitation that counsel re-urge the motion at the time of voir dire, constituted reversible error per se. We are of the opinion that such action of the trial judge in deferring final disposition of the matter until the time of voir dire did not violate La.C.Cr.P. art. 621. Further, we are of the opinion that the defendant, having failed to re-urge the motion at the time of voir dire as requested by the trial judge, should be precluded from arguing on appeal that the trial court erred in denying the motion without a contradictory hearing.
La.C.Cr.P. art. 621 provides:
"A motion for a change of venue may be filed by either the state or the defendant. It shall be filed in accordance with Article 521; or thereafter, in the discretion of the court, any time before the first witness is sworn at the trial of the merits. The motion shall be in writing, sworn to by mover or his counsel, and shall contain:
(1) Allegations of fact upon which the motion is based; and
(2) A statement that the motion is not made for the purpose of delay, but to obtain a fair and impartial trial.
A contradictory hearing shall be held upon the motion."
Despite the mandatory language of this article, it is not error for a trial judge to fail to hold a contradictory hearing on a motion for change of venue where ultimate action on the motion is deferred until voir dire. State v. Bolton, 354 So.2d 517 (La. 1978).
In Bolton, the defendant argued that the trial judge erred in failing to hold a contradictory hearing on his motion for change of venue and in "referring" the matter to voir dire because such action denied him the right to call independent witnesses to demonstrate *165 community prejudice. The defendant did state in support of his motion that he had "lived a fast life in the past" and didn't think that the "peoples" of the parish would give him a fair trial. At that point, the trial judge deferred the matter to voir dire, and the defendant failed to object to the procedure or raise the matter again. We held that the defendant could not be heard to complain on appeal as to an issue he failed to bring to the attention of the trial court. 354 So.2d at 519.
A similar situation is present here. Brogdon's counsel brought it to the attention of the trial judge at the hearing on the motion to suppress that he had filed a motion for change of venue. The judge asked the defendant to defer an ultimate determination of the merits of his motion until voir dire. Indeed, the judge made it clear that the motion would be granted if the proper grounds were shown at that time. At the risk of being repetitive, we again note that the defendant did not object to the judge's ruling at that time, nor did he re-urge the motion before, during, or after voir dire, bypassing the opportunity to offer any evidence from independent witnesses to demonstrate community prejudice. It would be manifestly unfair to allow the defendant to remain mute on the matter at trial and then to urge on appeal improper denial of his motion once the jury returned a verdict which was unfavorable to him. We are doubtful that the motion would have been granted considering the decided lack of community prejudice revealed on voir dire.
Here, the defendant was afforded a lengthy voir dire examination of all potential jurors. Indeed, a jury was ultimately impaneled. The burden is upon the defendant to prove that there exists such a prejudice in the collective minds of the people of the community that a fair and impartial trial is impossible. State v. Bell, 315 So.2d 307 (La.1975); State v. Flood, 301 So.2d 637 (La.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782. Because the defendant failed to object to the actions of the trial judge in deferring final disposition of the venue question until voir dire, and because the defendant failed to raise again the motion at the time of voir dire despite the invitation of the trial judge, it is impossible for us to say that the defendant proved the existence of such prejudice that a change of venue should have been granted.
Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment, the defendant argues that the trial court erred in refusing to accept his guilty plea. Prior to trial, the defendant sought writs from this court on that very issue, and we denied writs on December 4, 1981. State v. Brogdon, 407 So.2d 727 (La.1981).
La.C.Cr.P. art. 557 provides:
"A court shall not receive an unqualified plea of guilty in a capital case. If a defendant makes such a plea, the court shall order a plea of not guilty for him."
Additionally, a defendant in a capital case may not waive his right to a trial by jury. La. Const. art. I, sec. 17. The trial judge is free to reject a defendant's unilateral offer to plead guilty in order to deprive the state of the right to seek the death penalty in an appropriate case. State v. Robinson, 421 So.2d 229 (La.1981). Here, the state made it clear to the judge that it would seek the death penalty. The judge properly rejected the unqualified plea.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 3
By this assignment, the defendant urges that the trial court erred in denying his motion to quash the venire from which the jury was chosen on the grounds that teenagers over the age of eighteen and poor whites were excluded. Specifically, the defendant asserts that the jury pool in St. Charles Parish is selected from the list of registered voters in the parish, and teenagers and poor whites are sub-classes which take very little interest in registering to vote. He further contends that he was denied an opportunity to present evidence on the issue.
*166 Our review of the record shows that the defendant's contentions are without merit. His motion was argued and considered at length at the conclusion of voir dire. Further, the use of voter registration lists as the sole source from which a venire is compiled is a constitutionally sound practice unless the defendant can show that such a practice discriminates against a certain class of persons to the extent that the venire does not represent a fair cross-section of the community. State v. Eastin, 419 So.2d 933 (La.1982); State v. Daigle, 344 So.2d 1380 (La.1977).
The defendant made no showing that the exclusion of non-voters from the venire operated as class discrimination against teenagers and poor whites or that the venire did not represent a reasonable cross-section of the community. Other than the bare allegation, there was no showing that teenagers or poor whites were less likely to register to vote than other groups. Of the prospective jurors in this case, 63 were male, 47 were female, 80 were white, and 30 were black. This is virtually a perfect cross-section of the population of St. Charles Parish. Without a showing that teenagers of voting age and poor whites were discriminated against as a class, the motion was properly denied.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 4
By this assignment, the defendant urges that the trial court erred in denying the motion to suppress his confession. Specifically, he argues that his statement cannot be regarded as having been given freely and voluntarily because his "intellectual disability" precluded his complete understanding of the essential nature of his constitutional rights. The defendant alleges that he is mildly retarded with an I.Q. of 64 to 70.
After a careful review of the record, we conclude that the defendant's statement was freely and voluntarily given. The interrogating officers took extra precautions to ensure that the defendant fully understood his constitutional rights. In this case, the defendant's asserted lack of intelligence does not operate to vitiate the voluntariness of his confession.
Upon learning that the defendant had only an eighth grade education, the interrogating officer took precautions to ensure that the statement was taken in compliance with LSA-R.S. 15:451.[5] Prior to the defendant's statement on the details of the incident, the following interchange occurred:
* * * * * *
"Q: [D]o you understand your Miranda rights warning that [was] just read to you and you signed?
A: Yes, sir.
Q: Do you know how to read and write the English language?
A: Yes, sir.
Q: Do you understand that you do not have to say anything to us at this time and that if you do it will be used against you in court?
A: Yes, sir.
Q: Do you want to talk to a lawyer right now and have him present with you before you say anything to us?
A: No, I don't need a lawyer. I just want to get this off my mind.
Q: Have any threats been made to you by any policeman or anyone tonight to make you give us this statement?
A: No, sir.
Q: With your rights in mind, the right not to say anything to us at this time, your right to have a lawyer with us at this time, I will ask you once more John, do you still want to give us a statement now?
A: Yes, sir. I'm ready ...."
* * * * * *
*167 At the conclusion of the detailed description of the crime, the following interchange occurred:
* * * * * *
"Q: Is there anything that you would like to add to this statement ... [or] delete from it?
A: That's about [it], sir.
Q: [H]as anyone made any threats to you to make you give us this statement or has anyone promised you anything?
A: No, sir ....
Q: Have you read this statement before you signed it?
A: Yes, sir. I have.
Q: Is this your statement, true and correct, John?
A: Yes, sir. That's how it went down...." The defendant's initials appeared at the end of each colloquy. At the hearing on the motion to suppress, the interrogating officer testified that the defendant was asked to read the statement thoroughly and did so for approximately ten minutes before signing. Testimony revealed that the defendant had been read his Miranda rights no fewer than five times prior to the confession. At all times the officers used simple language, and the defendant's own psychologist testified that his statement that he "didn't need a lawyer" and that he "just wanted to get this off his mind" indicated that the defendant understood the consequences of his confession.
When the issue in a case on appeal is whether a defendant's lack of intellectual ability precluded him from effectively understanding the essential nature of his constitutional rights, much weight is accorded the trial court's assessment. State v. Coleman, 395 So.2d 704 (La.1981); State v. Trudell, 350 So.2d 658 (La.1977); State v. White, 329 So.2d 738 (La.1976). The conclusion of the trial court as to the admissibility of a confession should not be overturned unless it appears that the conclusion is wholly unsupported by the evidence. State v. Dison, 396 So.2d 1254 (La.1981); State v. Jackson, 381 So.2d 485 (La.1980); State v. Manning, 380 So.2d 46 (La.1980).
Our review of the record reveals that the evidence in this case preponderates in favor of the trial judge's determination that the defendant's confession was freely and voluntarily given. Despite the defendant's low intelligence level, the state has affirmatively shown that the statement was given freely and voluntarily in compliance with LSA-R.S. 15:451. Moderate mental retardation or low intelligence do not of themselves vitiate a free and voluntary confession. The critical factor in such cases is whether or not the defendant was able to understand the rights which were explained to him. State v. Anderson, 379 So.2d 735 (La.1980); State v. Collins, 370 So.2d 533 (La.1979). The defendant in this case clearly understood his rights.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 5
By this assignment, the defendant argues that the trial court erred in finding that he was sane at the time of the offense and that he was competent to stand trial. Specifically, he contends that there was overwhelming evidence that he was insane at the time of the offense and that he is presently incapable of understanding the nature of the proceedings against him or aiding in his defense. We disagree.
In terms of capacity to proceed, the defendant must presently lack the capacity to understand the nature of the proceedings against him or to assist in his defense. The incapacity must result from a mental disease or defect. La.C.Cr.P. art. 641; cf. State v. Bennett, 345 So.2d 1129 (La.1977). The determinations of the trial judge in such matters are entitled to great weight on appellate review and will not be overturned absent an abuse of discretion. State v. Rochon, 393 So.2d 1224 (La.1981); State v. Jones, 376 So.2d 125 (La.1979); State v. Hamilton, 373 So.2d 179 (La.1979).
Contrary to the contentions of the defendant, the evidence is overwhelming that he is presently capable of understanding *168 the nature of the proceedings against him and aiding in his defense. At the sanity hearing, the two court appointed sanity commissioners, Dr. Ritter and Dr. Super, both testified that the defendant suffered from no mental disease or defect which would render him incapable of understanding the nature of the proceedings against him or incapable of aiding in his defense. The defendant presented no evidence in rebuttal. The two physicians recognized that the defendant was of borderline intelligence; however, while subnormal intelligence is a relevant factor in assessing a defendant's present capability to stand trial, it is not of itself dispositive of the issue. State v. Square, 257 La. 743, 244 So.2d 200 (1971), vacated in part on other grounds, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760; State v. Bailey, 233 La. 40, 96 So.2d 34 (1957). Here, the great weight of the evidence indicated that the defendant was presently capable of standing trial, despite his low intelligence. Therefore, it cannot be said that the trial judge abused his great discretion in reaching this determination.
For purposes of the insanity defense, the burden is on the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense. The defendant must show that he suffered from a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct in question. LSA-R.S. 14:14; State v. Roy, 395 So.2d 664 (La. 1981); State v. Poree, 386 So.2d 1331 (La. 1980); State v. Weber, 364 So.2d 952 (La. 1978). The relevant inquiry on appeal is whether the defendant adduced evidence of his insanity at the time of the offense such that any rational trier of fact could have concluded that he carried the burden of proving his insanity by a preponderance of the evidence. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Roy, supra. In our opinion, it could not have been concluded by a rational trier of fact that the defendant proved his insanity by a preponderance of the evidence.
At trial on the merits, the defendant's own psychologist admitted that the defendant generally knows the difference between right from wrong and was presently thinking clearly enough to appreciate the consequences of his actions and the gravity of his offense. The principal focus of the defendant's argument centered on his low intelligence and alleged tendency to experience "psychotic episodes" of violent behavior.
The two sanity commissioners, on the other hand, both testified in rebuttal that the defendant had understood the natural and probable consequences of his acts toward the victim and knew at that time the difference between right and wrong. Both doctors agreed that the defendant was of borderline intelligence. As in assessing capacity to proceed, subnormal intelligence is a relevant factor in assessment of the defendant's insanity at the time of the offense. State v. Square, supra; State v. Bailey, supra. However, low intelligence is not of itself dispositive of the issue, and the great weight of the evidence here indicates that the defendant's low intelligence was not such an overwhelming factor that he should be deemed insane at the time of the offense. Therefore, due to the paucity of evidence which would support the defendant's claim of insanity at the time of the offense, and due to the great weight of evidence tending to negate that claim, we find that the defendant failed to carry his burden of proof by a preponderance of the evidence.
In conclusion, we find that, under these circumstances, the trial judge did not abuse his great discretion in finding that the defendant was capable of standing trial. State v. Rochon, supra. Neither may it be said that the evidence of the defendant's insanity at the time of the offense was such that any rational trier of fact could have concluded that he had carried the burden of establishing his insanity by a preponderance of the evidence. State v. Roy, supra.
This assignment is without merit.

*169 ASSIGNMENT OF ERROR NO. 6
By this assignment, the defendant argues that the trial court erred in admitting into evidence an authentic copy of the victim's birth certificate in order to prove that she was under twelve years of age for purposes of aggravated rape under LSA-R.S. 14:42. The authentic copy of the certificate which was introduced had been issued by the office of the State Registrar and bore his official seal. Specifically, the defendants asserts that the "best evidence" of the victim's age would have been the testimony of her mother, or, in the alternative, the state custodian of the original certificate.
Copies of an official document which are certified to by the officer who is the legal custodian of such documents are equivalent to the original in authenticity. LSA-R.S. 15:457. We have held that a copy of a victim's birth certificate certified to by the State Registrar is admissible into evidence to establish the victim's age for purposes of the carnal knowledge statute, even in the absence of testimony by the mother of the victim. State v. Dierlamm, 189 La. 544, 180 So. 135 (1938). We see no reason why the same rule should not obtain for purposes of aggravated rape.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 7
By this assignment, the defendant argues that the trial court erred in admitting into evidence certain gruesome photographs of the victim's body. Two of the objectional photographs were introduced during the guilt phase of the trial, and two more were introduced during the penalty phase. The defendant makes no specification as to which of these four photographs he deems objectionable, therefore it will be assumed that he questions the admission of all. Because we must vacate the death sentence on other grounds and order a new penalty hearing, we need not assess the admissibility of the two photographs at the penalty phase.
The first of the two photographs introduced at the guilt phase was a color photograph of the body of the victim lying in the darkness some distance away from the photographer. In the foreground was the brick used to kill the victim and a discernable trail of blood was visible from that point to where the body lay in the distance. The second photograph was taken at the morgue and depicts a close-up of the victim's back showing numerous stab wounds, scratches, and bruises.
It is well-settled that the admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. It is equally well-settled that post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, and to provide positive identification of the victim. State v. Tonubbee, 420 So.2d 126 (La.1982); State v. Perry, 420 So.2d 139 (La.1982); State v. Lindsey, 404 So.2d 466 (La.1981).
The two photographs admitted at the guilt phase were relevant to show the location of the body, the manner of death and attempted disposal of the body, and the specific intent of the defendant to kill the victim. The pictures were relatively inoffensive, and it is abundantly clear that their probative value outweighed any prejudice to the defendant.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 8
By this assignment, the defendant argues that the trial court erred in admitting evidence which was illegally seized from Perritt's automobile without a search warrant. These items were two blood samples taken from inside the vehicle, a belt, a knife, and a pair of men's undershorts. Specifically, the defendant claims that the car had been in police custody for more than eight hours before it was searched and there were no exigent circumstances justifying the search without a warrant.
Our review of the record shows that the defendant failed to move to suppress the evidence before trial. He did object to its admission at trial. Pre-trial, the defendant *170 had moved to suppress only his confession and certain hair, blood, and saliva samples taken from him with his consent. At the time the motion was heard on these items, the defendant had already been made aware of the state's intention to introduce into evidence the items seized from Perritt's vehicle. This specification of error seems simply to be an afterthought.
The proper method by which to attack the unconstitutionality of a search and seizure is by the motion to suppress. La.C.Cr.P. art. 703; State v. Hardy, 344 So.2d 1018 (La.1977); State v. Collins, 308 So.2d 263 (La.1975). A simple objection at trial to the admissibility of evidence may not serve as a basis upon which to attack a search and seizure as unconstitutional. State v. Royal, 255 La. 617, 232 So.2d 292 (1970).
Here, we had a contemporaneous objection, but no motion to suppress. Therefore, the defendant should be precluded from challenging on appeal the constitutionality of the search of Perritt's vehicle, especially in light of the overwhelming evidence against the defendant derived from independent sources. Cf. Lawrence v. Henderson, 478 F.2d 705 (5th Cir.1973); State v. Royal, supra.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 9
By this assignment, the defendant argues that the trial court erred in denying his motion for a mandatory mistrial under La.C.Cr.P. art. 770. Specifically, the defendant alleges that the prosecutor improperly elicited testimony from a defense witness concerning other crimes committed by him.
During trial, the defendant called to the stand a psychologist whose testimony was intended to prove his insanity defense. She testified that the defendant had a tendency to react violently during certain "psychotic episodes." Under cross-examination, the psychologist stated that, in her opinion, the defendant was likely to suffer a violent episode when drinking. When asked how she formulated that opinion, the psychologist stated that the defendant had a "history of assault" and had told her that he had been arrested for assault once before.
La.C.Cr.P. art. 770 provides:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;"

* * * * * *
It is readily apparent that the prosecutor did not elicit testimony which requires a mandatory mistrial within the meaning of art. 770(2). The witness did not intimate knowledge of any details of past crimes which the defendant may have committed but merely stated that the defendant had told her of past violent acts and a past arrest for assault. These statements were intended to bolster her claim that the defendant had suffered an uncontrollable "psychotic episode" at the time of the offense. It was proper for the state to ascertain the basis for the psychologist's conclusion that drinking triggered violent behavior in the defendant. Moreover, the trial judge admonished the jury to disregard any testimony regarding the defendant's arrest for a past assault.
Indeed, these statements which the defendant now claims were improper and entitle him to a mistrial were intended to bolster his own defense of insanity. In situations such as this, we cannot allow the defendant to decry the testimony of his own witness as to the basis for her conclusion that the defendant had suffered an uncontrollable psychotic episode at the time of the offense. In light of these circumstances, the jury surely viewed the defendant's objection as incongruous with his insanity defense. At any rate, any error which arose out of the witness' testimony was cured by the trial court's admonishment. *171 Cf. State v. Albert, 381 So.2d 424 (La.1980); State v. Procell, 365 So.2d 484 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046; State v. Lewis, 353 So.2d 703 (La.1977).
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 14
By this assignment, the defendant argues that the trial court erred in refusing to admonish the jury to disregard an implication by one of the sanity commissioners testifying for the state that the defendant had "confessed" to the offense. This witness was testifying in rebuttal to the defense psychologist who claimed that the defendant had suffered a "psychotic episode" at the time of the offense and did not at that time know the difference between right and wrong.
The following colloquy occurred:
* * * * * *
"Q: Did your examination also delve into the sanity of the defendant at the time of the commission of the crime?
A: To a degree. We did discuss with him what had been going on in his mind and his behavior the day of the offense.
Q: From your evaluation and examination were you able to determine whether or not he knew the natural consequences of his acts and knew the difference between right and wrong?
A: Yes, I determined that he did know the nature of his acts and did knowthe nature and consequences of his acts and did know the difference between right and wrong.
Q: At the time of the commission of the crime?
A: Yes."

* * * * * *
In support of his plea of not guilty by reason of insanity, the defendant attempted to demonstrate by the testimony of his psychologist his state of mind at the time of the offense. Certainly it is fundamental in our law that the state has the right by way of rebuttal testimony to establish that the defendant did indeed know the difference between right and wrong at the time of the offense. Further, we do not agree with the defendant that the testimony cited implies that the defendant "confessed" to the crime. The testimony merely relates the doctor's opinion as to the state of mind of the defendant at the time the offense was committed. At any rate, any objection to the testimony became moot when the defendant's full confession to the murder was introduced into evidence later in the trial.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 15
By this assignment, the defendant urges that we reverse his death sentence because the prosecutor, during rebuttal closing argument at the penalty phase, referred to him as an "animal." Because we must vacate the death penalty on other grounds, this assignment is moot. However, even if it were not moot, the defendant failed to object to the comment or move for a mistrial under La.C.Cr.P. art. 771.
La.C.Cr.P. art. 771 provides:
"In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial."
*172 We have held that where the defendant neither objects to the comments made to the jury, moves for a mistrial, or asks that the jury be admonished to disregard the comments, then the trial judge had been afforded no opportunity to cure the alleged error, and the matter is not appropriate for appellate review. See La.C.Cr.P. art. 841; State v. Bernard, 358 So.2d 1268 (La.1978).
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 16
By this assignment, the defendant urges that the trial court erred in failing to wait 24 hours after denial of his motion for a new trial before imposing sentence. Because we must vacate the death penalty on other grounds, this assignment is also moot. However, even if it were not moot, our review of the record shows that the trial judge did wait 24 hours before imposing sentence.
La.C.Cr.P. art. 873 provides that sentence shall not be imposed until at least twenty-four hours after a motion for a new trial is overruled. Our review of the record revealed that the trial judge stated as follows:
* * * * * *
"[On the case State v. Brogdon,] let the record reflect that in accordance with law yesterday we were in court and the court denied the motion for a new trial filed on behalf of John Brogdon. And according to Article 873 of the Code of Criminal Procedure he is entitled to a 24-hour delay.
John Brogdon wished to exercise that privilege and have that 24-hour delay, and this matter was reset for sentencing today."

* * * * * *
Therefore, based on the record, the trial court was in complete compliance with the strictures of art. 873. In any event, failure of the trial court to wait the entire twenty-four hour period before imposing sentence is harmless error absent a showing that the failure to observe the delay caused the defendant to suffer some actual prejudice thereby. State v. White, 404 So.2d 1202 (La.1981). The defendant has made no such showing in this case.
Accordingly, this assignment of error lacks merit.

REVIEW OF THE PENALTY PHASE
Under La.C.Cr.P. art. 905.9, we are required to review every death sentence. Our review of the record reveals that the trial judge in this case gave to the jury the identical instruction which we deemed improper in State v. Watson, 430 So.2d 1130 (La.1982).
The judge instructed the jury as follows:
* * * * * *
"[If there is no doubt in your mind that the state has established one or more of the aggravating circumstances which I have just outlined for you], then you are obliged to return a sentencing recommendation of death.

* * * * * *
[I]f the state fails in establishing the aggravating circumstances beyond a reasonable doubt, the jury would not be authorized to even consider the penalty of death. In that event, the sentence would be life imprisonment without parole...." (emphasis supplied)

* * * * * *
As we noted in Watson, this is an inaccurate statement of the law. Under La.C.Cr.P. art. 905.3, the jury may consider recommending the death penalty upon finding that the state has proved one or more aggravating circumstances beyond a reasonable doubt. This instruction incorrectly told the jury that it must return a recommendation of death if it found that the state had proved one or more aggravating circumstances beyond a reasonable doubt. Such an improper instruction deprives the jury of the sentencing discretion which is vital to the constitutionality of our capital sentencing scheme. State v. Watson, supra; cf. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
The trial judge did give a rather detailed explanation of mitigating factors which the jury could have considered in deciding whether or not to recommend the death *173 penalty. However, this explanation did nothing to vitiate the judge's mandatory directive that the jury must recommend the death penalty if it found the existence of one or more aggravating circumstances. If anything, the explanation probably indicated to the jury that the presence of such mitigating factors would serve to negate an initial finding of any aggravating circumstances rather than merely operate to mitigate against the death penalty once such aggravating circumstances were found. Further, we can find no place in the record where the judge corrected his misstatement or the existence of any other facts which might distinguish this case from Watson.
Therefore, as in Watson, we find that the inaccurate jury instruction in this case requires that we set aside the penalty of death and order that the penalty phase be re-tried in accordance with the law.

DECREE
For the foregoing reasons, the conviction of the defendant, John Brogdon, is affirmed. However, because of the erroneous jury instruction delivered by the trial judge at the penalty phase, the sentence of death is vacated, and the case is remanded to the trial court for a new penalty hearing in accordance with the law.
AFFIRMED; SENTENCE OF DEATH VACATED AND CASE REMANDED.
DIXON, C.J., concurs, disagreeing with the treatment of assignments # 1 and 4, and being of the opinion that those issues referred to as "moot" are likely to recur on retrial and should be treated to guide the trial court.
NOTES
[1] Perritt was convicted of first degree murder for his part in this crime.
[2] The trial judge properly refused to accept the guilty plea in a capital case. See La.C.Cr.P. arts. 552, 557: "A court shall not receive an unqualified plea of guilty in a capital case. If a defendant makes such a plea, the court shall order a plea of not guilty for him." See assignment of error number two, infra.
[3] There is some discrepancy in the order of treatment of these assignments by the defendant in his brief on the merits. Originally, the defendant filed only fifteen assignments with the trial court; however, his brief on the merits discusses only eleven of the original fifteen and adds a sixteenth. For purposes of clarity, we treat these assignments in the order filed with the trial court, adding the sixteenth urged in brief.
[4] The defendant only exercised nine of his twelve peremptory challenges.
[5] Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, meances, threats, inducements or promises.