502 So.2d 265 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
Joseph Patrick ROY, Defendant-Appellant.
No. CR86-672.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
Writ Denied May 15, 1987.
*266 G. Paul Marx, Marx & Marx, Lafayette, for defendant-appellant.
Carrol L. Spell, Robert Idggs, Keith A. Stutes, Asst. Dist. Attys., Lafayette, for plaintiff-appellee.
Before FORET, STOKER and YELVERTON, JJ.
YELVERTON, Judge.
Defendant Joseph Patrick Roy, 34, was tried for the second degree murder (LSA-R.S. 14:30.1) of Elizabeth Brown, his six month old daughter, and convicted by a jury of the responsive crime of manslaughter (R.S. 14:31). The sentence does not appear in the record. The defendant appeals the conviction raising several assignments of error. We affirm.
Defendant and his common law wife, Mary Brown, lived together with their three children ages five, three and six months, in rural Lafayette Parish. On July 30, 1985, defendant was trying to get the baby, Elizabeth, to stop crying. He tried giving it a bottle but the baby kept on crying. He then hit the baby under an eye with his fist, and on the back of its head with his fist, and shook it. After this, as defendant described it, food began to come out of the baby's nose and its mouth and it began to shake, then went limp. The baby died.
A forensic pathologist for the Lafayette coroner's office did an autopsy the next morning. He found external evidence of recent trauma in the form of a small bruise or contusion below the left eye. Internally, after removal of the boney portion of the skull over the brain, he found a large blood clot over the surface of the brain. The doctor termed this blood clot an acute injury, inflicted certainly less than 48 hours and probably less than 24 hours before death. In the doctor's opinion the cause of death was a head and brain injury, and the most likely cause of the injury was shaking. He opined that the hemorrhage was not caused by any blunt trauma, such as a blow, but entirely by a forceful shaking.
Juvenile authorities came into the case and within two days there was a continued custody hearing as to the other children in juvenile court. During a recess at this hearing the defendant asked to talk to a deputy in the juvenile division of the Lafayette Parish Sheriff's Office. The deputy (Detective Flynn) and the defendant met privately and after the defendant had his rights explained to him and appeared to *267 understand them, a recorded interview took place during which defendant told the officer that he had hit the baby under the eye pretty hard and that it immediately began to shake, then he hit it in the back of the head and it began to expel food through its nose and mouth, and afterwards he tried to wake her up with a wet towel, but could not.
The grand jury indicted the defendant for second degree murder. The defendant pleaded not guilty and not guilty by reason of insanity. Later the defendant filed a motion to suppress the statement on the ground that he did not knowingly and intelligently waive his rights when he made the statement.
After the jury was picked to try the case, the trial judge heard the motion to suppress. At the hearing, the trial judge heard the testimony of the detective from the juvenile division who took the statement, as well as the testimony of Dr. Ted Friedberg, a clinical psychologist who did a psychological and intellectual evaluation on the defendant, and the testimony of the defendant himself. The court listened to the tape recording of the statement. The trial court then denied the motion to suppress.
At the trial the defendant took the stand and denied that he had ever hit the child but he declared that he was with the child when it died and that he had shaken the baby. He said this several times and explained that it was after he shook the baby that food began to come from its nose.
The defendant testified that the child died on a Tuesday afternoon and that on the previous Friday, according to what his wife told him, their little five year old boy had been carrying the baby and dropped it twice on a hard surfaced road.
Mary Brown, the child's mother and defendant's common law wife, testified that she was not in the room with them when the baby died but that defendant was there.

ASSIGNMENT OF ERROR NO. 1
By this assignment the defendant argues that the trial court should have suppressed the statement because the defendant was incapable of knowingly and intelligently waiving his rights.
At the hearing on the motion to suppress, the sheriff's deputy testified concerning the taking of the statement. He knew the defendant was hard of hearing and that he had a slow mind. For example, although the defendant had asked to talk to him, he was afraid of the deputy's gun and had to be reassured by the deputy. The deputy said he gave the defendant his Miranda rights, breaking down each question into simple words, and that the defendant told him he understood and waived those rights. It was after this detailed explanation that they went on record on the tape. The deputy declared that he believed defendant did in fact understand his rights and that he wanted to give a statement.
At the motion to suppress hearing Dr. Ted Friedberg testified that he had seen the defendant on one occasion when he did a Wechsler Adult Intelligence Scale Test on him and found him to be functioning in the moderate range of retardation with an IQ of 52. He said the man could not understand words like "threat." When told that defendant had obtained a Louisiana driver's license, he could not explain how that could have happened and thought it was probably a "fluke." The Wechsler test was conducted orally, because defendant could not read. The doctor said that in the testing he did not often rephrase questions, but he would sometimes ask the patient if he understood the question. (During the course of his testimony at the motion to suppress, Dr. Friedberg never mentioned that defendant was partially deaf, and that this was taken into account in the administration of the oral testing. He did, however, acknowledge during his trial testimony in connection with the defense of insanity, that he was aware when he conducted the test that the defendant had some kind of hearing disability.)
*268 At the hearing on the motion to suppress it developed that defendant had lived with his common law wife, Mary Brown, for several years and that they had three children, with another born after Elizabeth's death. Defendant had held a steady job with a fence company for 11 years, receiving a regular paycheck which he endorsed and cashed, bringing the money home to Mary. He owned a car, and he had passed the test for and obtained a driver's license.
Although Dr. Friedberg testified that he did not think Joseph understood all his constitutional rights as contained in the waiver, the trial judge weighed all the factors, including listening to the recordation of defendant's statement and comparing it with defendant's live testimony at the hearing on the motion to suppress, and ruled that the defendant did make a knowing and intelligent waiver of his rights and that the statement was freely and voluntarily given. The trial judge's decision is supported by the jurisprudence of this state where the courts have repeatedly held that moderate mental retardation and low intelligence do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Collins, 370 So.2d 533 (La.1979); State v. Anderson, 379 So.2d 735 (La.1980); State v. Lewis, 412 So.2d 1353 (La.1982); and State v. Brogdon, 426 So.2d 158 (La.1983).
When the issue in a case on appeal is whether a defendant's lack of intellectual ability precluded him from effectively understanding the essential nature of his constitutional rights, much weight is accorded the trial court's assessment. State v. Brogdon, 426 So.2d 158 (La.1983).
We conclude that the state met its burden to insure that the inculpatory statement and waiver of rights were made freely and voluntarily. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
Appellant contends that the trial court erred in allowing the state to impeach its own witness, Mary Brown, and in allowing the hearsay testimony of two of the state's witnesses to be admitted for the purpose of impeaching Mary Brown.
A statement made out of court may be used as a prior inconsistent statement to impeach a witness. As a general rule, a party may not impeach his own witness, but he may do so if he is taken by surprise by the testimony of the witness. La.R.S. 15:487. The meaning of "surprise" includes the failure of the witness to testify as expected on some material matter against the party introducing him and in favor of the other side. La.R.S. 15:488. By repudiating an earlier statement to police, a witness testifies upon a "material matter against the party introducing him and in favor of the other side" and the state can then argue surprise and may properly impeach its own witness. State v. Brown, 414 So.2d 689 (La.1982). In such cases, the method of impeachment is limited to evidence of prior inconsistent statements. La.R.S. 15:487. To impeach with a prior inconsistent statement, the witness must first be asked whether he made the statement and he must be referred to the time, place and circumstances of the statement to allow him the opportunity to explain it. If the witness does not distinctly admit making the statement, evidence that he did make it is admissible. La.R.S. 15:493.
Mary Brown, mother of the child and defendant's common law wife, gave a statement to Detective Flynn shortly after the child's death in which she said that she was with Joseph and the baby at the time of its death and saw Joseph hit the baby. The state called Mary as its first witness. Starting at the very beginning of her testimony, with the first question as to her whereabouts, it evidently became obvious to the trial judge that Mary was determined to put herself away from the scene and to deny having seen Joseph hit the baby. Thereafter she kept injecting responses that put her out of the room and added that JoJo, her small son, saw what happened and told her.
*269 The trial court permitted the state to impeach Mary.
The foundation for impeachment was properly laid. Informed of the time, place and circumstances of the statement, Mary was asked if she had told Detective Flynn that she saw Joseph hit the baby. She denied that she had seen anything. She was asked if she remembered telling the detective that Joseph was mad at her and she answered she did not remember. From then on, evidence that she made the statements was admissible. There is no merit to this prong of this assignment of error.
Another argument concerning this assignment of error is that Detective Flynn, another state witness, was permitted to testify concerning things Mary said that she never denied having said, and that this, not being impeachment evidence, was erroneously admitted hearsay. Specifically, Flynn was allowed to testify that Mary told him in her statement that Joseph was wearing a heavy ring on his hand when he hit the baby. We agree that this was error. However, the damage to defendant's case was slight. It was not Joseph's striking the baby that caused her death. Just because hearsay evidence is improperly admitted does not necessarily keep a defendant from obtaining a fair trial. State v. McMahon, 391 So.2d 1120 (La.1980).
We also find no merit to the complaint that Odelia Guidry, the defendant's sister, who was another state witness, was permitted to give hearsay testimony as to what Mary said. We note that some of Odelia's testimony, both on cross examination and redirect, concerned material favorable to the defendant, such as the incident when JoJo was supposed to have dropped the baby on the road. There were no objections to this testimony. A contemporaneous objection is required to preserve an error, such as the admission of hearsay, for appellate review. State v. Ratcliff, 416 So.2d 528 (La.1982). We will not consider the hearsay testimony to which an objection was not made.
Finally, defendant complains of double hearsay when Detective Flynn was asked if Odelia told him that Mary told her that Joseph was mad at Mary. Defendant's brief is in error regarding this question. The question Odelia was asked was whether she told Flynn that Joseph told her he was mad at Mary. In earlier questioning a proper foundation had been laid, and the court permitted the impeachment of Odelia (as well as Mary) on that very subject, so that this was a proper question for impeachment purposes. See State v. Banks, 446 So.2d 497 (La.App. 4th Cir.1984). As it turned out, however, to this particular question Detective Flynn unaccountably responded "No". Thus, to the extent that a showing of Joseph's anger directed at Mary at the time of the infant's death might have benefitted the state's case, this question did not damage the defense even if it was improperly asked.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
Appellant claims the trial court erred in allowing the jury to view gruesome photographs of the baby, and that the prejudicial effect of this viewing outweighed the probative value of the pictures and unfairly prejudiced the defendant.
In his statement to Detective Flynn Joseph said that he hit the baby with his fist, once under the eye and once on the back of the head. At the trial he testified that he never hit the baby but that he shook her, and that after that food started coming out of her nose and after that, after a while, she stopped breathing. Dr. Charles Oden, a forensic pathologist for the Lafayette Coroner's Office, performed an autopsy. He found small external bruises about the head but he did not believe that these could have caused the child's death. Inside the skull, however, he found a large blood clot over the surface of her brain. Dr. Oden presented uncontroverted expert testimony that the baby's death was caused by bleeding in the brain which caused brain edema. Dr. Oden testified that the type of injury suffered by the child was most likely *270 caused by violently shaking the child back and forth tearing small vessels within the skull which led to the bleeding, and clot, that he described.
There were four photographs used by the doctor in his testimony and shown to the jury. Three demonstrated the bruises and supported his testimony that there was no significant injury that could have come from an external blow, such as hitting the baby. The other photograph was a picture of the infant's exposed brain. It showed a large, dark blood clot right over the white brain surface. This was the visual evidence that Dr. Oden relied upon to determine the cause of death. The doctor himself testified that the photographs would be useful as visual evidence to substantiate his verbal findings.
Unpleasant photographs are admissible if their probative value outweighs their prejudicial effect. The trial court's determination of the admissibility of evidence is not to be disturbed absent a clear abuse of discretion. State v. Segura, 464 So.2d 1116 (La.App. 3rd Cir.1985).
In this case Joseph admitted that he shook the baby. The coroner explained that it was very likely that shaking caused this baby's death. It is probably difficult for the average layman to understand how that could have happened. This photograph, a veritable black and white demonstration, explained it. We find no error in the trial court's conclusion that the probative value of the photograph outweighed its prejudicial effect.

ASSIGNMENT OF ERROR NO. 4
Appellant claims the trial court erred in ruling without reasons or argument on many evidentiary questions. Appellant claims this practice denied him the right to preserve the errors for appellate review.
Appellant is correct that unless an objection and the reasons therefor are timely made, an error in the court's ruling is considered waived. La.C.Cr.P. art. 841; State v. Motton, 395 So.2d 1337 (La.1981). However, it is the duty of the attorney to make his objection known to the court.
The record reflects that there were no objections by the defendant in which he was unable to argue his side. Although the judge did in certain instances rule before hearing from defendant, defendant was still allowed to present his reasons for objection and preserve them in the record. There are no assignments of error in this appeal concerning which defendant was unable to preserve an objection by not being allowed to state his reasons for it. This claim has no merit.

ASSIGNMENTS OF ERROR NOS. 5 & 6
Appellant claims the trial court erred in failing to give a jury instruction that dealt with motive. The court properly denied this instruction. Motive is not an element of the crime with which defendant was charged. State v. Johnson, 324 So.2d 349 (La.1975). See also State v. Loyd, 455 So.2d 687 (La.App. 2nd Cir.1984), writ denied, 461 So.2d 313 (La.1984). We find no error in the trial court's ruling.
Appellant also protested generally the use by the trial court of what was described in the brief as a "handbook of jury instructions" in the preparation of the charges. We have not been provided the "handbook" to which reference was made and it is not otherwise identified in the record, and we are unable to consider this assignment of error.
The conviction is affirmed.
AFFIRMED.