STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 10-1018


STATE OF LOUISIANA

VERSUS

AARON W. ARDOIN


**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 75984F
HONORABLE JOHN LARRY VIDRINE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Billy Howard Ezell, J. David Painter, and James T. Genovese, Judges.


**AFFIRMED.**


**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
**Aaron W. Ardoin**

**Trent Brignac**
**District Attorney, Thirteenth Judicial District Court**
**Julhelene E. Jackson**
**Assistant District Attorney**
**P. O. Box 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**EZELL, JUDGE.**

On May 6, 2008, the Defendant, Aaron W. Ardoin, was indicted by a grand jury with aggravated rape, a violation of La.R.S. 14:42; indecent behavior with a juvenile, a violation of La.R.S. 14:81(A)(1); and oral sexual battery, a violation of La.R.S. 14:43.3(A)(2). Following a jury trial, on May 27, 2010, the Defendant was found guilty as charged on all counts. The Defendant was sentenced on July 15, 2010, to life imprisonment at hard labor for aggravated rape and to ten years at hard labor for both oral sexual battery and indecent behavior with a juvenile, to run concurrently with each other and with the life sentence. The Defendant did not file a motion to reconsider sentences.

The Defendant is now before this court on appeal, asserting that the trial court erred in denying his motion to suppress three statements and that his enhanced sentence for indecent behavior with a juvenile was in violation of the Sixth Amendment of the United States Constitution.

## FACTS

Over a period of approximately nine months, the Defendant performed or forced the victim to perform various sexual acts, including oral sex and sexual intercourse. At the time the offenses were committed, the Defendant was forty-three years old, and the Victim was nine years old.

## ASSIGNMENT OF ERROR NUMBER ONE

By this assignment of error, the Defendant contends that the trial court erred in denying his motion to suppress three statements given by the Defendant to police over a course of two days. The Defendant maintains that his statements were not freely and voluntarily given because the police used improper questioning techniques and failed during the first two statements to assure that he understood what rights he

1

was waiving. The Defendant also complains that the trial court improperly placed the burden upon the Defendant to prove that his statements were not freely and voluntarily made after full advisement and waiver of his constitutional rights. As such, the Defendant urges this court to conduct a de novo review applying the correct standard.

Louisiana Code of Criminal Procedure Article 703 reads in pertinent part:

A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.

B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.

. . . .

D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.

As required by La.Code Crim.P. art. 703, the Defendant filed a motion to suppress on July 30, 2009, arguing that statements which may incriminate him "were the result of persistent and repeated interrogations by numerous skillful law enforcement officers and were elicited in the absence of counsel and without an intelligent or knowing waiver of counsel." Further, the Defendant maintained that "[p]sychological ploys, threats and promises, fatigue and physical violence combined during many hours of questioning to overcome Defendant's will and rendered any admission involuntary and coerced in violation of the Fifth and Fourteenth Amendments to the United States Constitution." Because the issues of voluntariness and the validity of waiver of counsel would be determined based on the credibility of police officers rather than the Defendant, the Defendant requested that a special jury be empaneled prior to trial to determine if he understood his right to counsel and

2

made a knowing and intelligent waiver and if the statements were induced by physical violence, threats, or promises.

A hearing on the motion was held on May 13, 2010, and three statements and two *Miranda* waiver forms were introduced into evidence by the parties. Following the testimony of Chief Gregory Dupuis and Detective Todd Ortis of the Mamou Police Department, the officers who participated in taking the Defendant's statements, the trial court found that the Defendant failed to carry his burden of proof and denied his motion to suppress the statements.

## Burden of Proof

The Defendant asserts that his motion sufficiently gave the State notice of the alleged bases for the suppression of his three statements. The Defendant complains, however, that the trial court erred in requiring him to prove the statements were not voluntarily made. The Defendant maintains that the State, not the Defendant, was required to prove that the statements were freely and voluntarily made after full advisement and waiver of rights. The Defendant concludes that the trial court improperly shifted the burden of proof and asks this court to conduct a de novo review, applying the correct standard.

The State concedes that La.Code Crim.P. art. 703(D) places the burden of proof on the State to prove the admissibility of a purported confession or statement made by a defendant. The State maintains, however, that La.Code Crim.P. art. 703(D) also places a burden of proof on the Defendant to prove the ground of his motion. As such, the State contends that the trial court correctly required the Defendant to present his motion rather than requiring the State to establish that the statements were admissible.

3

In *State v. Rodrigue*, 409 So.2d 556, 561 (La.1982), the supreme court explained:

> The general rule is that, on trial of a motion to suppress, the burden of proof is on the defendant to prove the grounds of his motion. La.C.Cr.P. art. 703(D). One exception to the rule is that the State has the burden of proving beyond a reasonable doubt the voluntariness of a confession which the defendant has moved to suppress as evidence at the trial on the merits. La.C.Cr.P. art. 703(D); La.R.S. 15:451; *State v. Glover*, 343 So.2d 118 (La.1977); *State v. Johnson*, 363 So.2d 684 (La.1978); *State v. Bouffanie*, 364 So.2d 971 (La.1978); *State v. Volk*, 369 So.2d 128 (La.1979); *State v. Jones*, 376 So.2d 125 (La.1979).

Additionally, "[a]t this judge-hearing, the state must prove voluntariness beyond a reasonable doubt, and the defense may cross-examine the state's witnesses and put on its own case. *See* Comment, Confessions in Louisiana Law, 14 La.L.Rev. 642, 650-652." *State v. Lovett*, 345 So.2d 1139, 1142 (La.1977).

At the hearing, despite defense counsel's assertion that the burden was on the State to show that the confession was voluntary and admissible pursuant to La.Code Crim.P. art. 703(D), the trial court stated, "Since this is your motion, I think you need to call your first witness." Defense counsel proceeded with the presentation of the Defendant's case, calling the officers who participated in taking the statements to testify. When the Defendant rested his case, the trial court concluded that he "failed to carry the burden." Considering same, we find that the trial court incorrectly placed the burden on the Defendant to show that his statements were not voluntary rather than requiring the State to show that they were voluntary.

On cross examination, however, we note that the State presented evidence to prove that the Defendant's three statements were voluntary and admissible, making reference to the respective statements and introducing them into evidence. Although the trial court placed the burden on the Defendant, the State, nonetheless, complied

4

with La.Code Crim.P. art. 703(D) and presented its case to establish that the Defendant's statements were voluntary and admissible.

## Waiver of Rights

### Defendant's First Statement

Chief Dupuis and Detective Ortis testified that the Defendant's first recorded statement was taken on February 7, 2008. The Defendant did not sign a waiver of rights form at the time of this statement. Chief Dupuis stated that the Defendant, was advised of his rights on February 3, 2008, four days earlier, when he was initially booked, and he signed a waiver of rights form. Chief Dupuis observed that the waiver was signed in two places indicating, one, that he was read rights, and two, that he understood his rights, was willing to answer questions without an attorney present, and that he had not been threatened nor had promises been made to induce him to give up his rights. The waiver was introduced by the Defendant. Lastly, Chief Dupuis indicated that the Defendant did not ask to stop questioning at any time.

Detective Ortis testified that he checked the Defendant's file to make sure a waiver of rights form was in the file. Detective Ortis also confirmed that the Defendant understood his rights before taking his statement. According to Detective Ortis, they were probably interviewing witnesses and collecting evidence during the four days that elapsed from the time the Defendant signed the waiver and when his first statement was taken to determine what questions to ask the Defendant. At the time of the Defendant's statement, there was no doubt in Detective Ortis' mind that the Defendant understood his rights.

At trial, Officer Christopher Godeaux of the Mamou Police Department testified that the waiver upon which Chief Dupuis and Detective Ortis relied was obtained by him after the Defendant was detained and transported to the police

department. According to Officer Godeaux, he reviewed each of the five enumerated rights with the Defendant and confirmed his understanding of same. Also, on the waiver form, the Defendant indicated that he understood his rights and was willing to answer questions without an attorney present. He also confirmed that he had not been threatened or promised anything to answer questions or give up his rights. The Defendant then signed the waiver form.

The transcribed statement was submitted into evidence by the State. The recorded statement was conducted by Detective Ortis and Chief Dupuis. Detective Ortis and Chief Dupuis began at 2:10 p.m. and concluded at 2:38 p.m. At the beginning of the statement, Detective Ortis and Chief Dupuis confirmed that the Defendant had been read his rights at the time he was booked and understood same:

> TODD: O.K. WHENEVER THEY PICKED YOU UP, THEY ADVISED YOU OF YOUR RIGHTS? THEY READ YOU YOUR RIGHTS?
>
> AARON: YEA BECAUSE STEVEN CAME PICK ME UP FROM REDDELL AND BROUGHT ME TO THE HOUSE. I STAYED OUTSIDE AND THAT UH.....
>
> TODD: BUT WHEN THE POLICE CAME TO TALK TO YOU, WHEN THE POLICE ARRESTED YOU, THEY READ YOU YOUR RIGHTS?
>
> CHIEF DUPUIS: WHEN THEY BOOKED YOU IN THAT BOOKING ROOM, WHEN THEY.....
>
> TODD: THEY TOLD YOU THAT YOU HAD THE RIGHT TO REMAIN SILENT?
>
> AARON: OH YEA. HE TALKED TO ME IN THE CAR AND I TOLD HIM, I HAD TO TELL HIM THAT THEY BROUGHT ME IN AND HE DID.
>
> CHIEF: BUT DO YOU KNOW, THE POINT IS, HE READ YOUR RIGHTS TO YOU, DO YOU KNOW YOUR RIGHTS, OR YOU NEED US TO READ THEM TO YOU AGAIN?
>
> AARON: YES, YES, NO, I UNDERSTAND.

CHIEF: AND YOU UNDERSTAND THEM?

TODD: O.K.

**Defendant's Second Statement**

A second recorded statement was taken from the Defendant the following morning, February 8, 2008. At the hearing, Chief Dupuis and Detective Ortis testified that the Defendant was pulled out and questioned that morning because he was being transferred to Ville Platte. They thought it would be the last opportunity they would have to talk to him because he would no longer be housed in their facility. According to Chief Dupuis, he asked the Defendant if he wanted to talk to them, and the Defendant responded affirmatively. Chief Dupuis confirmed that the Defendant understood his rights prior to giving the statement. Also, Detective Ortis referred the Defendant to the waiver of rights form he previously signed on February 3, 2008. Again, Detective Ortis testified that he had no doubt that the Defendant understood his rights when they took his statement.

Chief Dupuis' testimony at trial differed from his hearing testimony with regard to who initiated the statement. At trial, Chief Dupuis testified as follows:

> Q. Why did you go back to take another statement, did the defendant want to give a statement?
>
> A. He requested from a trustee, if I remember right, to talk to us before we would transfer, we were fixing to transfer him to Ville Platte because it was a felony charge we transfer them here.
>
>      . . . .
>
> Q. But he denied everything and then the next time he initiated it through a Trustee?
>
> A. Yes Ma'am, and also the fact that we were transporting him to Ville Platte we figured it was a good chance before he left the office to question him again, but he had requested to talk to us through a trustee.

The transcribed statement introduced into evidence by the State reflects that the questioning began at 8:13 a.m., before the Defendant was transported to Ville Platte. The Defendant did not sign a waiver of his rights form associated with this statement. Chief Dupuis testified, however, he was certain that the Defendant's *Miranda* rights were read to him prior to questioning. Detective Ortis asked the Defendant if he understood his rights as follows:

> TODD: O.K. AND UH, YESTERDAY WE HAD AN OPPORTUNITY TO TALK TO YOU. RIGHT?
>
> AARON: YES SIR.
>
> TODD: AND WE ASKED YOU A COUPLE OF QUESTIONS AND YOU WEREN'T QUITE SURE OR DIDN'T HAVE AN ANSWER FOR QUITE A FEW OF THEM YESTERDAY, RIGHT?
>
> AARON: NAW, I REALLY, THAT'S NOT EXACTLY, I HAD TO THINK ABOUT IT, BUT LAST NIGHT I SAT THERE AND THOUGHT ABOUT IT AND IT COMES UP WITH COMMON SENSE.
>
> TODD: SO, UH, YOU WANT TO TALK TO US AGAIN THIS MORNING?
>
> AARON: YEA.
>
> TODD: AND I'M GONNA ASK YOU AGAIN, YOU UNDERSTAND YOUR RIGHTS, RIGHT?
>
> AARON: YES SIR.

On appeal, the Defendant complains that his first statement was not taken until February 7, 2008, several days after signing a waiver on February 3, 2008. The Defendant maintains that this fact alone indicates that he was not executing the waiver to permit questioning by law enforcement but, instead, was completing necessary paperwork for booking purposes and remained silent. Further, the Defendant contends that his statement was not spontaneously given, but was initiated by Detective Ortis' interrogation.

8

In support of his argument, the Defendant refers to *State v. Fowlkes*, 25,870 (La.App. 2 Cir. 3/30/94), 634 So.2d 953, wherein the defendant was advised of his *Miranda* rights upon his arrest and again while en route to the police station, remaining silent on both occasions. During booking at the police station, the defendant, charged with simple burglary, was asked how he had gained entry. The defendant responded that he had used his hands. After this inculpatory statement, the defendant was informed of his *Miranda* rights a third time and was asked to sign a waiver. The defendant refused to sign the waiver. On appeal, the defendant argued that his silence after he was *Mirandized* showed that he did not want to give a statement to police, and thus, the officer should not have asked him any questions. In analyzing the issue, the court stated:

> When an accused has been questioned in a custodial environment, the prosecution is required to establish that his interrogation followed the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *State v. Simmons*, 443 So.2d 512 (La.1983).
>
> Here, after the defendant's arrest and while he was being booked at the police station, the arresting officer asked defendant how he had entered the market. This constitutes custodial interrogation because it was questioning initiated by a law enforcement officer subsequent to the arrest or deprivation of the defendant's freedom of action. *Miranda, supra*. When a statement made during custodial interrogation is sought to be introduced into evidence, the state bears the heavy burden of showing that the defendant knowingly and intelligently waived his privilege against self-incrimination and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1979); *State v. Brown*, 384 So.2d 425 (La.1980).
>
> Granted, the waiver of *Miranda* rights need not be explicit and may be inferred from the circumstances surrounding the statement. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Brown, supra*. However, a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that an inculpatory statement was eventually obtained. *Miranda, supra*.

*Id*. at 957. The court concluded that the defendant's subsequent incriminating statement was not spontaneously given because he had chosen to remain silent on two

9

occasions after being read his *Miranda* rights. The court found that the statement was the result of questioning by the officer and was not given spontaneously. Lastly, the court ruled that the State failed to meet its heavy burden of showing the defendant either said or did something to indicate a waiver.

We find that the instant case is distinguishable from *Fowlkes*. Although the Defendant remained silent after he was *Mirandized* during booking, he signed a waiver of those rights. Also, there is no evidence to suggest that he was questioned soon after he was *Mirandized* and signed the waiver, yet opted to remain silent. The record indicates that he simply was not questioned at that time and that officers likely waited to question him after an investigation into the allegations. According to Detective Ortis and Chief Dupuis, before the Defendant was questioned, he was asked if he had been advised of his rights at the time he was booked and, specifically, if he had been told he had the right to remain silent. Further, Chief Dupuis asked the Defendant if they needed to read his rights to him again. The Defendant confirmed that they did not need to read his rights again and that he understood them.

The Defendant also contends that the second statement was tainted by the first statement and that the State failed to establish that the Defendant initiated the second statement. Because we find that a valid waiver was obtained prior to the first statement, the second statement was not tainted by the first. With regard to the validity of the waiver prior to the second statement, we find, like the first statement, the ruling in *Fowlkes* to be inapplicable. Although the Defendant did not initiate the statement, both Chief Dupuis and Detective Ortis confirmed that the Defendant understood his rights prior to taking the Defendant's statement.

10

**Defendant's Third Statement**

The Defendant argues that his third statement was tainted by statements made to officers during his transport from Mamou to Ville Platte. The Defendant contends that Chief Dupuis relied upon information alleged to have been provided by the Defendant during his transport and without benefit of being *Mirandized*. The Defendant maintains that police cannot question first and then give the necessary warning before re-interrogation; to do so makes the warning ineffective. In support of his argument, the Defendant refers to *Missouri v. Seibert*, 542 U.S. 600, 601, 124 S.Ct. 2601, 2603 (2004), wherein the Supreme Court held, "[I]t is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content."

The Defendant's third recorded statement was taken on February 8, 2008, after he was transported to Ville Platte. At the suppression hearing, both Chief Dupuis and Detective Ortis testified that the statement was taken at the Defendant's request. Chief Dupuis explained that following their arrival in Ville Platte earlier that morning, the Defendant told him that he wanted to talk to them again because there was something he needed to tell them. The Defendant asked if they would return to talk to him. Chief Dupuis told the Defendant they would come back after lunch, and per the Defendant's request, Chief Dupuis and Detective Ortis returned to take the Defendant's third statement around 1:00 p.m. Chief Dupuis denied using any coercion and maintained that the statement was initiated by the Defendant.

Chief Dupuis and Detective Ortis also testified that the Defendant was read his rights prior to taking the statement. To make sure he was thorough, Detective Ortis stated that he checked off each right after he advised the Defendant of the respective right, and that he verbalized his understanding of same. Both Chief Dupuis and

11

Detective Ortis witnessed the Defendant's signature. At the time the statement began, Detective Ortis asked the Defendant again if he understood his rights.

At trial, Chief Dupuis testified as follows about his conversation with the Defendant following his transport from Mamou to Ville Platte:

Q. And on the way here, did he indicate anything to you and to Chief Ortis?

A. He did, on the way over here, just getting into Ville Platte he asked if he could talk to us when we got over here, and he started telling me things about the case, and I told him just hold up, when we get over there see [sic] if we can talk to you, and my office called me and we had to go back to town, and we ended up coming back later that afternoon.

Q. So, after giving a second voluntary statement in Mamou, on the way here he initiated that he wanted to give another statement again?

A. Correct

Q. Now, y'all got here, I'm assuming it was still early in the morning?

A. Probably about 9:00 o'clock, maybe a little before that.

Q. And then y'all went back to Mamou because y'all didn't have time to take the statement, but y'all left him here?

A. Correct

Q. And then y'all came back?

A. Right

Q. And do you recall coming back and being present when he completed another Miranda rights form?

A. Yes ma'am.

Q. And I'm showing you, it's been marked as State Exhibit Two, is this your signature here?

A. Yes ma'am, as witness.

Q. So, you were a witness when Detective Todd Ortis went through this form with him again?

A. Right

12

Q.     And again, y'all went through each enumerated right, correct?

A.     Correct

Q.     And again, and this would have been at what, 1:10 that afternoon?

A.     Right, 1:10.

Q.     Y'all asked, do you understand your rights and he said?

A.     Yes

Q.     Are you willing to answer any questions without an attorney, and he said?

A.     Yes

Q.     Have any threats or promises been made to you, or has any pressure of any kind been used to try and get you to answer questions or to give up any of your rights, and he answered?

A.     No

Q.     And then he again, the defendant, you saw him sign this again?

A.     Yes ma'am.

Q.     And again, you witnessed this along with Detective Ortis?

A.     Right

Q.     So, along with the initial Miranda right[s] form, explaining his rights to him and making sure that he understood it before statement number one and statement number two, y'all did another Miranda right[s] sheet before y'all began the third statement?

A.     Correct

Q.     So, if he wanted to change his mind before giving another statement that he voluntarily requested that morning he had what, four or five hours to think about that?

A.     Yes ma'am.

Q.     But when you got back here, he still wanted to give that statement?

A.     Right

13

Q.     And your transcript of the third statement indicates it began at 1:12 P.M., so that was within two minutes of him signing that form?

A.     Correct

Q.     I'm assuming enough time to get the tape recorder together and ....

A.     Set up the equipment, right.

Q.     Now, in that third statement y'all again in this statement, and make sure on the record, that he understands his rights and he indicated that he did, correct?

A.     Right

Q.     Now, in this statement he indicated that he told you that he wanted to tell you something really bad, that there's something that he had to talk to you about, right?

A.     Right

Q.     That was in your truck?

A.     Yes ma'am.

Q.     And what did he tell you?

A.     He told me that she performed oral sex on him, and that he did have intercourse with her, or he had stuck his penis inside her.

Q.     I know it's been a long time, and I'm going to show you that statement. When you began to question him, wasn't it about whether or not he had put his penis inside of her?

A.     What, I begin here?

Q.     But that's what you're questioning him in regard to?

A.     No, I'm asking him basically what, you talking about her?

Q.     No, here.

A.     Oh, down here, I'm sorry. Right, by sticking his penis in her, right.

Q.     He had told you that in the truck?

A.     Yes ma'am.

14

Q. And then he again told you that here?

A. Somewhere later on, yes ma'am.

Q. But didn't he tell you, but I didn't come inside of her?

A. Right

Q. That's what he had told you in the truck?

A. Yes ma'am.

The transcribed statement reflects that questioning started at 1:12 p.m. and concluded at 1:24 p.m. Detective Ortis confirmed that the Defendant was advised of his rights before he was questioned, stating as follows:

TODD: UH, BEFORE WE TURNED ON THE TAPE, AARON, I ADVISED YOU OF YOUR RIGHTS, RIGHT?

AARON: YEA.

TODD: DO YOU UNDERSTAND YOUR RIGHTS AND YOU WANT TO TALK TO THE CHIEF, YOU HAVE TO SAY YES OR NO.

AARON: YES SIR.

TODD: O.K. AND YOU WANT TO TALK TO CHIEF DUPUIS AND MYSELF RIGHT NOW?

AARON: YEA.

TODD: ALRIGHT.

CHIEF DUPUIS: O.K. AARON, WHEN I BROUGHT YOU TO VILLE PLATTE, I GUESS ABOUT 8:30 THIS MORNING, YOU TOLD ME WHEN I DROPPED YOU OFF THAT YOU HAD THOUGHT ABOUT IT AND YOU WANTED TO TELL ME WHAT REALLY HAPPENED, RIGHT, IS THAT RIGHT?

AARON: YEA.

CHIEF: AND WE CAME BACK TO TALK TO YOU.

AARON: YEA.

CHIEF: O.K. WELL I'M HERE TO TALK TO YOU, WHAT DO YOU HAVE TO TELL ME?

15

After establishing how the Defendant met the Victim and her family, Chief Dupuis stated:

> CHIEF: O.K. NOW YOU WANT TO TELL ME WHAT HAPPENED, LIKE I SAID BEFORE, THE TWO PREVIOUS INTERVIEW'S [sic] THAT WE DID, THERE IS [sic] ALLEGATIONS FROM THE LIL GIRL THAT YA'LL HAD SOME SEXUAL ACTIVITY BETWEEN YA'LL SELVES [sic] AND YOU, YOU WERE KINDA DANCING AROUND IT AND NOT WANTING TO REALIZE WHAT HAPPENED AND THEN NOW YOU WANT TO TALK TO ME ABOUT IT, SO YOU WANT TO TELL ME EXACTLY WHAT HAPPENED?
>
> AARON: WELL PRETTY MUCH TO ME, ALL IT WAS, WAS PLAYING AROUND LIKE LIL KIDS, LIKE OLDER PEOPLE WOULD PLAY WITH LIL YOUNG KIDS AND ........
>
> CHIEF: YOU TOLD ME IN MY TRUCK THAT YOU STUCK YOUR PENIS IN HER.
>
> AARON: I MAY HAVE AT ONE TIME, BUT, I, I, I, ........
>
> CHIEF: LISTEN, WAIT, WAIT, WAIT, HOLD UP ........ I DON'T WANT "I MAY HAVE", I DON'T WANT "I MIGHT HAVE", I DON'T WANT "I THINK I DID", OR "I THINK I DIDN'T", I WANT TO KNOW WHAT YOU KNOW. NOW WHEN WE DROVE UP HERE, YOU STOPPED ME IN THE PARKING LOT AND YOU SAID, CHIEF, I WANT TO TALK TO YOU, I DID DO THIS, I DIDN'T MAYBE, IN FACT YOU [sic] OWN WORDS WERE, "I DIDN'T COME INSIDE OF HER". YOU REMEMBER WHEN YOU TOLD ME THAT?
>
> AARON: YES.
>
> CHIEF: "BUT I DID STICK MY PENIS IN HER".
>
> AARON: BUT THAT HAS NOTHING TO WITH THE FIRST HOUSE I SAID, AT THE SECOND HOUSE IT MIGHT OF HAPPENED.

The Defendant did not raise this issue at the suppression hearing, nor did he object at trial on the basis that his statement was tainted by statements made to officers during his transport from Mamou to Ville Platte. As noted by the supreme court in *State v. Montejo*, 06-1807, p. 22 (La. 5/11/10), 40 So.3d 952, 967-68, *cert. denied*, ___ U.S. ___, 131 S.Ct. 656 (2010) (footnote omitted):

16

Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. *State v. Brown*, 434 So.2d 300 (La.1983) (rejecting defendant's alternative argument regarding the denial of his motion to suppress because he had not raised the issue at trial); *State v. Johnson*, 07-1040 (La.App. 4 Cir. 9/10/08), 993 So.2d 326 [*writ denied*, 08-2649 (La. 6/5/09), 9 So.3d 868] ("failure to raise a ground for suppressing an item of evidence in a properly filed motion to suppress waives such a basis for exclusion on appeal"); *State v. Jackson*, 04-1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, *writ denied*, 05-1740 (La. 2/10/06), 924 So.2d 162 (defendant is limited on appeal to the grounds he articulated at trial and a new basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal); see La.C.Cr.P. art. 841 (providing that a new basis for an objection cannot be raised for the first time on appeal).

Accordingly, the issue is not appropriately before this court for the first time on appeal and will not be considered herein.

Even considering the merits of the argument, the Defendant did not show that warnings were withheld until after he was interrogated and confessed. First, the statement at issue was not his first statement, but his third statement, the second of two statements taken that day. The Defendant was not new to being advised of his rights in conjunction with the instant charges. Additionally, when the Defendant started talking about the case during his transfer to Ville Platte, Chief Dupuis instructed him to wait until he could be properly interrogated later that afternoon. We find that the evidence does not support the Defendant's claim that he was questioned first, and then given the necessary warning before re-interrogation. Accordingly, this court finds that the *Miranda* warning and waiver signed prior to the Defendant's third statement were effective, and thus, there is no merit in the Defendant's claim.

For the reasons stated herein, we find that the Defendant waived his rights prior to giving his first, second, and third statements.

17

**Coercion**

The Defendant complains that Chief Dupuis constantly urged him to be a man and tell the truth, to spare the child from further medical, psychological, and legal exams, and to save himself by confessing. The Defendant also maintains that Chief Dupuis enticed the Defendant to confess by telling him that he would try to work something out with the district attorney. Lastly, the Defendant contends that Chief Dupuis misstated the strength of the State's case by telling the Defendant that the examining doctor reported that he and the Victim had intercourse, when in truth, there was no conclusive finding of sexual intercourse. The Defendant does concede, however, that the Victim's hymen was not intact as reflected in her medical records.

The Defendant contends that Chief Dupuis's statements and comments were more coercive than those found to be problematic in *State v. Lavalais*, 95-320 (La. 11/25/96), 685 So.2d 1048, *cert. denied*, 522 U.S. 825, 118 S.Ct. 85 (1997). In *Lavalais*, the defendant was told by an officer that he would go to jail if he did not take a polygraph test. He was also told that if he were truthful, he would be dealt with differently than a defendant who took the polygraph test and was found to be telling a lie. Also, the defendant was told that if he confessed, his jail time would be less. Lastly, the officer promised to talk to the judge and do whatever he could to help.

In determining whether the defendant's subsequent confession was voluntary, the supreme court stated:

> Before the state may introduce a confession into evidence, it must affirmatively show that the statement was voluntary and not induced by fear, duress, intimidation, menaces, inducements, or promises. La.Code Crim. P. art. 703(D); La. R.S. 15:451; *State v. Bourque*, 622 So.2d 198 (La.1993). The test for voluntariness requires a review of the totality of the circumstances under which the statement was given; any inducement offered is but one factor in that analysis. *State v. Lewis*, 539 So.2d 1199 (La.1989). Statements by police to a defendant that he would be better

18

off if he cooperated are not "promises or inducements designed to extract a confession." *State v. Petterway*, 403 So.2d 1157, 1160 (La.1981); *State v. Dison*, 396 So.2d 1254 (La.1981)

*Id*. at 1053. The court concluded that the defendant's fear of jail did not render his confession involuntary because he was told repeatedly that he was free to leave and did not have to take the polygraph exam. Although the court found problematic some of the officer's remarks, the court concluded that the comments taken in their entirety were not improper. The court reasoned:

> The thrust of [Officer] Cook's comments were that defendant would have an easier time if he confessed. Rather than being promises or inducements designed to extract a confession, these comments were "more likely musings not much beyond what this defendant might well have concluded for himself." *Petterway*, 403 So.2d at 1160.

*Id*. at 1053-54.

The Defendant also refers to *State v. Demming*, 40,033, pp. 5-6 (La.App. 2 Cir. 9/21/05), 911 So.2d 894, 897, wherein the court stated:

> As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *State v. Roddy*, 33,112 (La.App. 2d Cir.4/7/00), 756 So.2d 1272, 1276, *writ denied*, 00-1427 (La.5/11/01), 791 So.2d 1288. Even the slightest inducements held out by a person in authority such as a police officer or a prosecutor may render a confession involuntary. *State v. Jackson*, 381 So.2d 485 (La.1980); *State v. Hall*, 434 So.2d 517 (La.App. 2d Cir.1983); *writ denied*, 440 So.2d 759 (La.1983).

In *Demming*, the detective asked the defendant, "Do you want to tell the truth, you can't hurt yourself." *Id.* at 898. The court found that the detective's statement was not an inducement which rendered the defendant's subsequent confession involuntary, viewing the overall context in which the defendant had just been warned that anything he said would be used against him in court. The court concluded that the comment did not diminish the warning in such a manner as to cause confusion.

In reaching its decision, the *Demming* court relied on its decision in *State v. Hall*, 434 So.2d 517 (La.App. 2 Cir.), *writ denied*, 440 So.2d 759 (La.1983), wherein the officer told the defendant that it would be better or things would be easier if he cooperated and made a statement. The court found that the officer's comment did not amount to a prohibited promise or inducement designed to extract a confession but was no more than a mild exhortation to tell the truth.

In opposition to the Defendant's claim of coercion, the State refers to *State v. Blank*, 04-204 (La. 4/11/07), 955 So.2d 90, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007). In *Blank*, the defendant claimed that due to the length of the interrogation, he lacked the capacity to give a voluntary statement. On appeal, the court noted that although the defendant was at the station for approximately twelve hours, he was in police custody for only half of that time. Further, the court found nothing to suggest that the duration of the interrogation, alone, rendered it involuntary. The defendant made several trips to the restroom and drank sodas throughout the interrogation. Additionally, the defendant never requested to terminate the interrogation although he stated he was weary, cold, and suffered from intermittent back pain throughout the interview. The court concluded that such circumstances did not demonstrate coercion as the result of a lengthy interrogation.

The defendant in *Blank* also complained of mental and physical duress, pointing to instances when he mentioned he was cold or was experiencing pain in his back, head, or chest or when he appeared tired during the interview. The defendant also asserted that references to God, religion, and his deceased mother during the interrogation caused him to involuntarily confess. Lastly, he also complained that he was denied the opportunity to smoke a cigarette. Although the court found the defendant's factual allegations to be accurate, the court found that he did not show

20

that the State's conduct coerced his admissions or rendered the confession involuntary. The court found no evidence on the videotapes and verbatim transcript to show the officers exercising any type of coercion which would render his confession involuntary. The court found the majority of the interview extremely benign on the part of the officers, and the defendant was treated very well throughout. The officers accommodated the defendant when possible by providing him with drinks, use of the restroom, and heating the interrogation room. Although his request to smoke was first denied, after smoking a cigarette while alone in the restroom, the defendant was allowed to smoke from then on and was allowed to smoke before he confessed to any crimes. Regarding references to his deceased mother, the court ruled that appeals to a defendant's emotions and/or religious beliefs typically did not render an ensuing confession involuntary.

Lastly, the defendant claimed that his confession was illegally coerced by officers' relentless exhortations to tell the truth, combined with false suggestions that they possessed forensic evidence of his guilt. Despite repeated admonishments to tell the truth throughout the interrogation, the court found that officers did not promise the defendant anything in exchange for his confession other than the suggestion he could clear his conscience. In reaching its decision, the court noted that courts routinely hold that a mild exhortation to tell the truth or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession.

In the instant case, all three of the Defendant's statements were short, with the first and longest of the three statements lasting twenty-eight minutes. The Defendant's complaint centers, in part, on the following dialog between Chief Dupuis and the Defendant found in the his first statement:

21

CHIEF: O.K. IF THIS HAPPENED, YOU NEED TO BE MAN ENOUGH AND SAY IT HAPPENED AND DO WHAT WE GOT TO DO, BUT IF IT DIDN'T SHE'S GOT TO GO START, DOCOTOR'S [sic] ARE GOING TO BE CHECKING HER. SHE IS GOING TO HAVE TO START GIVING STATEMENTS IN LAFAYETTE. SHE IS GOING TO BE GOING THROUGH THE MILL, O.K. IF IT HAPPENED TO HER, SHE IS ALREADY GONE THROUGH ENOUGH.

AARON: O.K.

CHIEF: YOU UNDERSTAND WHAT I'M TELLING YOU? SHE DOESN'T NEED TO BE DRUG THROUGH NO MORE, SO IF IT HAPPENED, YOU NEED TO TELL ME. TELL ME WHAT HAPPENED, WE WILL GO TO THE D.A. AND WE WILL TRY TO WORK SOMETHING OUT. IF YOU TRY TO FIGHT THIS AND THIS LIL GIRL GOES AND SHE'S ALREADY SAYING ALL THIS, WHEN SHE GOES TO THE PHYSCOLOGIST [sic], MORE IS GOING TO COME OUT.

AARON: O.K.

CHIEF: DO YOU UNDERSTAND WHAT I'M SAYING? SO YOU NEED TO BE TRUTHFUL AND TELL US AND WE WILL TRY TO WORK SOMETHING OUT.

. . . .

CHIEF: YOU GONNA TAKE YOUR CHANCES LIKE THAT NOW? THAT'S WHAT YOU WANT TO DO? YOU KNOW WHAT AGGRAVATED RAPE TAKES, BRO, YOU WANT ME TO READ IT TO YOU IN THE BOOK?

AARON: NO.

CHIEF: YOU KNOW WHAT AGGRAVATED SEXUAL BATTERY COST? YOU ARE GONNA SPEND THE REST OF YOUR LIFE IN THE PEN IF THIS THING GOES TO COURT. THE REST OF YOUR LIFE. I WILL READ IT TO YOU.

AARON: I KNOW, BUT I DO NOT REMEMBER EVER SHOWING........

CHIEF: EVEDENTUALLY [sic] YOU DON'T WANT TO REMEMBER.

AARON: I'D, I'D REMEMBER IF I HAD............REMEMBER DOING IT.

22

CHIEF: OH I KNOW, BUT YOU DON'T WANT TO REMEMBER RIGHT NOW. AND YOU NEED TO CUZ WHEN IT'S GONNA START, WHEN WE ARE GONNA START BRINGING THIS LIL GIRL TO LAFAYETTE AND START TAKING STATEMENTS, AND WHEN SHE IS GONNA HAVE TO START GOING TO THE DOCTORS, YOU THINK THE D.A. IS GONNA CUT YOU ANY SLACK?

AARON: WELL NO I DON'T WANT NONE OF THAT TO HAPPEN.

CHIEF: WELL THAT'S WHAT IS GONNA HAPPEN.

AARON: BUT I DIDN'T THINK...........

CHIEF: IT'S GOTTA HAPPEN AND LET ME TELL YOU WHY IT'S GONNA HAPPEN? CUZ WE GOT TO DO IT TO PROVE IT, BECAUSE YOU WON'T SIT HERE AND BE MAN ENOUGH, SIT DOWN AND TAKE YOUR LICKS AND TELL ME THE F------ TRUTH. YOU GOT TO BE MAN ENOUGH. EVERYBODY SCREWS UP. I'VE SCREWED UP, HE HAS SCREWED UP, YOU SCREWED UP BEFORE IN YOUR LIFE. YOU GOT TO BE MAN ENOUGH TO SIT RIGHT THERE AND SAY, HEY I MESSED UP, I WAS DRINKING, THE LIL GIRL WAS COMING ON TO ME, I LET MYSELF GO, I SHOULDN'T OF DONE IT, BUT I DID IT.

AARON: BUT, I DON'T SEE HOW IT WOULD HAPPEN. THE ONLY TIME IT COULD OF [sic] HAPPENED IS WHEN I WAS BABYSITTING.

CHIEF: YOU KNOW BETTER THAN ME, BIG DADDY, BUT I'M TELLING YOU ONE THING, SHE'S ALREADY BEEN TO ONE DOCTOR HERE. WE START SENDING HER TO SPECIALIST AND THOSE CHILD PSYCOLOGIST [sic] AND YOU ARE IN A HELL OF A BIND. YOU KNOW THAT? YOU IN A HELL OF A BIND. NOW YOU CAN SAVE HER ALL THAT TROUBLE.

AARON: BUT WHY WOULD I PUT HER THROUGH THAT? THAT'S A LIL OLD TINY GIRL.

CHIEF: CUS YOU SCREWED UP. YOU MESSED UP. YOU MIGHT HAVE BEEN DRINKING. YOU HADN'T HAD SEX WITH ANOTHER LADY THERE IN FIVE YEARS, YOU KNOW, WE ARE ALL MEN, YOU UNDERSTAND. I KNOW WHAT A MAN FEELS LIKE WHEN HE HADN'T HAD SEX IN A LONG TIME. THINGS HAPPEN. I'M NOT SAYING IT'S RIGHT, BUT YOU GOT TO BE MAN ENOUGH TO TAKE YOUR LICKS AARON AND SAY, HEY, I SCREWED UP, DON'T PUT THE LIL GIRL THROUGH ALL THIS CRAP. THIS IS WHAT HAPPENED. THAT'S ALL YOU GOT TO DO. THAT'S WHAT YOU NEED TO DO. IF YOU CARE, ONE OUNCE FOR THIS LIL GIRL, THAT'S WHAT YOU NEED TO DO.

. . . .

CHIEF: WELL TAKE YOUR LICKS LIKE IT COMES. I DON'T KNOW WHAT ELSE TO TELL YOU. I WANTED TO GIVE YOU A CHANCE TO SAVE YOU AND THE LIL GIRL FROM ALL THIS, THAT'S YOU.

. . . .

CHIEF: NO I'M FINISHED. YOU READY TO FINISH OR YOU WANT TO TELL ME THE TRUTH? I CAN'T SIT HERE ALL AFTERNOON AND TRY TO MAKE YOU SAVE YOUR OWN BUTT. YOU DON'T WANT TO SAVE IT, THAT'S YOU.

. . . .

CHIEF: DON'T BE SORRY FOR ME. DON'T BE SORRY FOR ME AT ALL, I WAS TRYING TO HELP YOU.

AARON: YEA.

CHIEF: YOU GOT TO BE SORRY FOR YOU.

Although the exact duration of the Defendant's second statement is not known, it was significantly shorter than the first; it was less than half the number of transcribed pages. The statement began at 8:13 a.m., but there appears to be a typographical error at its conclusion, indicating that the statement ended at 1:16 p.m. Chief Dupuis testified that the Defendant was questioned prior to his transport to Ville Platte and was transported around 8:30 a.m.

Detective Ortis began questioning the Defendant as follows:

TODD: O.K. AND UH, YESTERDAY WE HAD AN OPPORTUNITY TO TALK TO YOU, RIGHT?

AARON: YES SIR.

TODD: AND WE ASKED YOU A COUPLE OF QUESTIONS AND YOU WEREN'T QUITE SURE OR DIDN'T HAVE AN ANSWER FOR QUITE A FEW OF THEM YESTERDAY, RIGHT?

AARON: NAW, I REALLY, THAT'S NOT EXACTLY, I HAD TO THINK ABOUT IT, BUT LAST NIGHT I SAT THERE AND THOUGHT ABOUT IT AND IT COMES UP WITH COMMON SENSE.

24

TODD: SO, UH, YOU WANT TO TALK TO US AGAIN THIS MORNING?

AARON: YEA.

Later, after the Defendant stated that the Victim took his hand one time and put it on her chest and between her legs, Chief Dupuis stated:

CHIEF: O.K.  NOW YOU ARE DOING THE RIGHT THING, O.K AND YOU ARE SAYING THE RIGHT THING.

AARON: YEA I'M SAYING WHAT I HAVE TO.

CHIEF: I KNOW, BUT YOU ARE CUTTING YOURSELF SHORT, BECAUSE WE KNOW THAT YA'LL HAD INTERCOURSE, O.K BECAUSE THE DOCTOR TELLS US THAT AND SHE TELLS US THAT.

Next, the officers stressed that the Defendant needed to tell the truth:

TODD: NOW YOU HEARD WHAT MR. CHRIS GODEAUX SAID YESTERDAY, WHAT SHE TOLD HIM.

AARON: YEA THAT SHE HAD BEEN ENTERED.

TODD: THE OFFICER STATED THAT YOU HAD PUT YOUR PENIS IN HER MOUTH, DO YOU REMEMBER HIM SAYING THAT YESTERDAY?

CHIEF: AARON YOU REALLY NEED TO COME AND TELL THE TRUTH, O.K. AS BAD AS IT HURTS AND AS BAD AS IT MAY SEEM..............

AARON: I MAY, I MAY HAVE, BUT, I REALLY CAN'T BELIEVE THIS.

CHIEF: (INAUDIBLE) WE CAN'T SAY MAY HAVE, MIGHT HAVE, OR.......YOU NEED TO REMEMBER AND YOU NEED TO COME CLEAN.  LIKE I SAID, IT YOU DON'T, WE ARE GONNA HAVE TO PUT THIS LIL GIRL THROUGH ALL THIS..........

AARON: NO I REALLY DON'T WANT THAT.  I MEAN, SHE BECAME PART OF MY FAMILY WHEN SHE BECAME PART OF MY NEPHEW.

CHIEF: AND SHE DOESN'T DESERVE IT EVEN IF SHE IS NOT FAMILY.

AARON: YEA I MEAN..........

CHIEF: ANY TEN YEAR OLD GIRL DON'T DESERVE............YOU KNOW WHAT EVER HAPPENED BETWEEN YA'LL, HAPPENED AND THERE IS REASONS AND THERE IS WAYS THINGS HAPPEN AND I UNDERSTAND WHERE YOU ARE COMING FROM, BUT ONCE IT HAPPENS, THEN YOU GOT TO TAKE THE RAP FOR IT, NOT THE TEN YEAR OLD GIRL. YOU UNDERSTAND, YOU GOT TO STAND UP AND SAY I'M THE ADULT, I MESSED UP............

Considering the totality of the circumstances under which these statements were given, we find Chief Dupuis' comments were similar to those made in *Blank*, *Lavalais*, and *Demming* and did not amount to coercion. During these brief statements, Chief Dupuis' comments were directed at making life easier for the Victim by eliciting the truth from the Defendant. Although Chief Dupuis indicated that he would try to work something out with the district attorney if the Defendant would tell the truth and make it easier for the Victim, Chief Dupuis did not make any promises. The record does not reflect that the Defendant's statements were the result of persistent and repeated interrogations by numerous skillful law enforcement officers, nor did the police take heightened steps to obtain incriminating statements as claimed by the Defendant.

Regarding the issue of misstatements or false indications of forensic evidence, we note that the issue was not raised at the suppression hearing, nor did the Defendant assert at trial that false claims of forensic evidence led to his confession. Failure to raise the ground for the purpose of suppressing his confession waives his right to consider the issue for the first time on appeal. La.Code Crim.P. art. 841(A); *Montejo*, 40 So.3d 952. Accordingly, the issue is not considered herein.

For the reasons stated herein, we find that there is no merit to the Defendant's argument that he was coerced by officer's during his three statements.

26

## ASSIGNMENT OF ERROR NUMBER TWO

In his last assignment of error, the Defendant argues that the trial court erred in sentencing him to ten years at hard labor for indecent behavior with a juvenile based upon findings of fact not reflected in the jury's verdict. The Defendant maintains that it was error to sentence him under the enhanced penalty provision of La.R.S. 14:81(H)(2) when the jury did not make a determination as to the additional element necessary to impose the enhanced penalty.

At the time of the offense, La.R.S. 14:81(H) read:

> H. (1) Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.

> (2) Whoever commits the crime of indecent behavior with juveniles on a victim under the age of thirteen when the offender is seventeen years of age or older, shall be punished by imprisonment at hard labor for not less than two nor more than twenty-five years. At least two years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

On appeal, the Defendant contends that the trial court erred in sentencing him under the enhanced sentencing provision in La.R.S. 14:81(H)(2) because the jury did not make a determination as to the Victim's age, an additional element necessary for imposition of the enhanced penalty. The Defendant refers, first, to the bill of indictment wherein he was charged in count one with committing indecent behavior with a juvenile "by committing a lewd and lascivious act upon a juvenile or in the presence of, one V.T.I., under the age of 17 by the defendant, with the intent of arousing or gratifying the sexual desires of either person, the defendant being over the age of 17 years."

27

Next, the Defendant refers to the jury charge regarding the elements of the offense. The jury was instructed that to find the Defendant guilty as charged, it had to find that "the victim was under the age of 17 and more than two years younger than the defendant at the time of the alleged offense." As such, the jury was not required to find that the victim was under the age of thirteen as required by La.R.S. 14:81(H)(2).

Lastly, the Defendant refers to the jury's verdict sheet, complaining that it did not list a separate finding by the jury that the Victim was under the age of thirteen. The only finding made by the jury was "Guilty of Indecent Behavior with a Juvenile."

In support of his argument, the Defendant refers, first, to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), wherein the defendant pled guilty to an offense which carried a sentencing range of five to ten years. The trial court, however, imposed a twelve-year sentence pursuant to a hate crime statute that allowed a sentence to be enhanced upon the trial judge's finding by a preponderance of the evidence that the crime was motivated by racial bias. In reversing the ruling, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490, 120 S.Ct. at 2362-63.

The Defendant also cites *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), wherein the Supreme Court followed its ruling in *Apprendi*. The defendant was sentenced to death for his capital felony-murder conviction. At the time of the offense, Arizona law allowed the trial judge alone to determine the presence or absence of the aggravating factors required for imposition of the death penalty. The Court, citing language from *Apprendi*, stated,

> The dispositive question, we said, "is one not of form, but of effect." *Id*., at 494, 120 S.Ct. 2348. If a State makes an increase in a defendant's authorized punishment contingent on a finding of fact, that fact--no matter how the State labels it--must be found by a jury beyond a reasonable doubt. See *id*., at 482-483, 120 S.Ct. 2348.

*Id.* at 602, 122 S.Ct. at 2439. In reversing the lower court ruling, the Court concluded that the Sixth Amendment required the enumerated aggravating factors be found by a jury, because they operated as the functional equivalent of an element of a greater offense.

Lastly, the Defendant refers to *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531 (2004), wherein the Supreme Court clarified its previous holdings in *Ring* and *Apprendi*. The defendant in Blakely pled guilty to kidnapping and was sentenced to ninety months. However, the facts to which he admitted in his guilty plea supported a maximum sentence of fifty-three months. Pursuant to state law, after making a judicial determination that the defendant acted with deliberate cruelty, the trial court imposed an enhanced sentence of ninety months. In reversing the lower court, the Supreme Court considered the holdings in *Apprendi* and *Ring*, recognizing that the facts supporting the sentence enhancement were neither admitted by the defendant nor found by a jury. The Court ultimately concluded that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id*. at 303-04, 124 S.Ct. at 2537.

Relying on the rulings in *Blakely*, *Ring*, and *Apprendi*, the Defendant asserts that the State was required to set forth the Victim's age in the bill of indictment, and the jury was required to find that the child was under thirteen at the time of the offense. Although the Victim's age was not admitted to at trial, the Defendant

29

contends that the pivotal issue is whether the jury made a finding beyond a reasonable doubt as to the Victim's age.

Both the Defendant and the State refer to a Louisiana case, *State v. Gibson*, 09-486 (La.App. 5 Cir. 3/9/10), 38 So.3d 373, *writ denied*, 10-802 (La. 11/5/10), 50 So.3d 814, herein a similar issue was raised. The defendant, convicted of sexual battery, argued that the trial court erred in sentencing him in accordance with the penalty provision of La.R.S. 14:43.1(C)(2), an enhanced penalty imposed when the offense involves a victim under thirteen years old and the offender is seventeen years or older. The defendant reasoned that neither the jury's verdict nor the jury instructions referenced the additional age requirements of La.R.S. 14.43.1(C)(2). The defendant was initially charged with aggravated rape but was found guilty of the responsive verdict of sexual battery. The jury, however, did not indicate on the verdict form that the defendant was older than seventeen years of age or that the victim was under the age of thirteen.

In *Gibson*, the court considered the Supreme Court's rulings in *Apprendi*, *Ring*, and *Blakely* and concluded that the trial court had committed an *Apprendi* violation. The court added that the State should have explicitly noted in the bill of information that the enhanced sentence provision in La.R.S. 14.43.1(C)(2) was applicable to the defendant and that the trial court should have included a jury instruction reflecting that the defendant's and the victim's ages were elements of same.

The *Gibson* court, however, did not end its analysis at that point but referred to *Neder v. United States*, 527 U.S. 19, 119 S.Ct. 1827, 1833 (1999), wherein the Supreme Court held that a "[jury] instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable

vehicle for determining guilt or innocence." The court in *Neder* then proceeded with a harmless error analysis and concluded, "In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee." *Id*. at 19; 119 S.Ct. at 1838.

The *Gibson* court also cited *Washington v. Recuenco*, 548 U.S. 212, 126 S.T. 2546 (2006), wherein the trial court imposed an enhanced sentence for a firearm based solely on the jury's finding that the defendant was armed with a deadly weapon. The Supreme Court ultimately held that the trial court's failure to submit a sentencing factor to the jury was not a structural error requiring a reversal of the conviction but was subject to a harmless error analysis.

Applying a harmless error analysis, the court in *Gibson* noted that the victim's date of birth was found in the bill information, the victim told the examining physician the year she was born, and the victim's mother's testimony indicated the year the victim was born. Accordingly, the court found that the jury could have concluded that the victim would have been approximately seven years old when the abuse began and nine years old when it ceased. With regard to the defendant's age, based on the testimony of the victim's mother, the defendant would have been approximately twenty-four years old when the abuse began and twenty-six years old when it ended. The court also ruled that jury observation could be used to infer a defendant's age when no direct evidence was presented. The court concluded that the *Apprendi* violation was harmless.

In the instant case, the alleged error is clearly an *Apprendi* violation. The State should have explicitly noted in the bill of information that the enhanced sentence

provision in La.R.S. 14:81(H)(2) was applicable to the Defendant, and the trial court should have included a jury instruction reflecting the Defendant's and the Victim's ages as elements of offense. We find that a harmless error analysis is appropriate in this case to determine whether the trial court's error in failing to instruct the jury as to the enhanced penalty provision of La.R.S. 14.81(H)(2) was harmless.

With regard to the bill of indictment, the Victim's age, nine years old, is not set forth in count one but is found in count three and was read aloud by the minute clerk on the first day of trial. Additionally, in discussing the sexual acts resulting in the charge of indecent behavior with a juvenile during opening statements, the prosecutor repeatedly stated that the Victim was nine years old at the time of the offense. On direct examination, the Victim testified that she was born on January 26, 1998, and turned nine years old on January 26, 2007. She also indicated on redirect examination that she was nine years old at the time of the offenses and had just turned ten when she gained the courage to report the offenses. The bill of indictment reflects that all the offenses for which the Defendant was charged, including indecent behavior with a juvenile, occurred on or about March 1, 2007, through November 30, 2007, when the Victim was nine years old. Lastly, the Victim's medical records introduced at trial included her date of birth.

With regard to the Defendant's age, his date of birth, January 29, 1964, is found in the bill of indictment and was reiterated by the Defendant at the beginning of all three recorded statements. The Defendant's date of birth also appears on the *Miranda* waiver dated February 3, 2008, and his age appears on the *Miranda* waiver dated February 8, 2008, both of which were introduced at trial. Lastly, Detective Ortis testified at trial that the Defendant was forty-four years old at the time he signed

32

the *Miranda* waiver dated February 8, 2008, and that he informed the Defendant that they wanted to speak to him about the rape of a "ten year old."

Considering the evidence viewed in the light most favorable to the prosecution, we find the evidence was sufficient for a rational trier of fact to conclude the State proved beyond a reasonable doubt that the Defendant was seventeen or older and that the Victim was under the age of thirteen. Further, the Defendant did not refute at trial any of the evidence regarding his age or the Victim's age, nor does he challenge evidence of same on appeal. Although the trial court clearly committed an *Apprendi* violation, we find the error was harmless. Accordingly, this assignment of error has no merit.

## CONCLUSION

The Defendant's convictions and sentences are affirmed.

**AFFIRMED.**